GLENDA H. NELSON v. A. P. ACKERMANN.

83 N. W. (2d) 500.

May 24, 1957—No. 37,070.

*Thomas K. Scallen,* for appellant.
*Gallagher, Farrish, Sheran & Zimmerman,* for respondent.

KNUTSON, JUSTICE.

Appeal from an order denying plaintiff's motion for a new trial.

This case arises out of a collision in which an automobile owned and operated by plaintiff's husband was struck from the rear by a motor vehicle operated by defendant, a state highway patrolman. The trial court directed a verdict on the issue of defendant's negligence and plaintiff's contributory negligence, the propriety of which is not involved here. As a consequence, only those facts essential to a consideration of the issues presented on this appeal will be stated.

On the evening of November 24, 1953, plaintiff, Glenda H. Nelson, was riding as a passenger in an automobile owned and operated by her husband, Norris C. Nelson, on State Trunk Highway No. 169. At a point approximately two miles north of Mankato, the car was traveling south on its right side of the highway at a speed of about 30 to 35 miles an hour when it was struck in the rear by an automobile driven by defendant, who was then acting as a state highway patrolman. Mrs. Nelson was thrown forward, striking her head on the windshield. Mr. Nelson was thrown against the steering wheel, and his hat flew into the rear seat of the car. Mr. Nelson shortly left his car to survey the damage to his car, which included a bent rear bumper, a dent in the shield at the back, a broken taillight, and a dent in the fender. Damage to defendant's car was slight. Plain-

tiff also left the car after remaining therein for a short time, and neither plaintiff nor her husband thought at the time that they were injured. After the collision, plaintiff and her husband drove home. The following day was Thanksgiving. Plaintiff testified that she felt stiff and sore the next day and had headaches and pain in the lower part of her back.

Plaintiff was 42 years of age, weighed 163 pounds, and was five feet two inches tall. She had been pregnant seven times, three of which resulted in miscarriages. One miscarriage occurred shortly after the collision, but it is conceded that the collision had no connection therewith.

Prior to the accident both Mr. and Mrs. Nelson had received treatment for various things at the Mankato Clinic. On the afternoon of the first day of the trial, Mrs. Nelson was examined by Dr. Mervin W. Dobson, a specialist in surgery, who testified that plaintiff had suffered a prolapsed intervertebral disc as a result of the collision. Plaintiff did not call any of the attending physicians or the doctors who had treated her prior to the accident and subsequent thereto.

Separate actions were commenced by Mr. and Mrs. Nelson, but they were consolidated for trial. The jury returned a verdict in favor of Mr. Nelson for $2,000 and in favor of plaintiff "in the sum of ($0.00) None Dollars." No appeal has been taken from the verdict in favor of Mr. Nelson, so the issues involved in that case will not be discussed except insofar as they affect the trial of Mrs. Nelson's case.

The contentions of plaintiff are: (1) That the verdict in her favor for no dollars was perverse; (2) that the verdict was inadequate and contrary to law and not justified by the evidence; and (3) that the court erred in allowing counsel for defendant to cross-examine plaintiff as to whether she would assert the privilege between physician and patient and in allowing counsel for defendant to comment on the assertion of the privilege in his final argument to the jury.

■ On the first two issues presented, it is apparently the contention of plaintiff that, inasmuch as there was no medical testimony to contradict the opinion of Dr. Dobson that plaintiff had suffered

a prolapsed disc as the result of this accident, the jury was compelled to find that the injuries which Dr. Dobson found at the time of the trial were the result of the accident, under the rule of O'Leary v. Wangensteen, 175 Minn. 368, 221 N. W. 430.

In several cases we have held that the rule of the O'Leary case is not an absolute one but that the jury may disregard the positive testimony of a witness, although he is not contradicted by other witnesses—

"* * * if his testimony is impeached and made improbable by reasonable inferences drawn from the surrounding physical facts and circumstances as disclosed by the record." Knudson v. Nagel, 238 Minn. 186, 191, 56 N. W. (2d) 420, 423.[1]

That rule is particularly applicable to opinion evidence. Where the jury may disbelieve the evidence upon which the opinion rests, whether it be based on assumed hypothetical fact or, as here, on a history given by a patient to her doctor, it must follow that the opinion is no more conclusive than the basic fact. In this case, Dr. Dobson based his opinion on statements of plaintiff that prior to the accident she had no headaches, backaches, or the other symptoms of a ruptured disc which Dr. Dobson found at the time of the trial. The evidence is undisputed that immediately after the accident neither Mr. Nelson nor plaintiff believed that she was injured. According to her own testimony, plaintiff did not consult a doctor until several months after the accident. None of the doctors who had attended her were called as witnesses. Dr. Dobson's opinion was far from conclusive or convincing. He first stated that plaintiff was suffering from a prolapsed intervertebral disc. When he was asked if he had an opinion as to whether this condition was the result of the collision, he said:

"Well, injury can cause these things all right. It would be just hard to say whether that particular injury was the cause of that."

---

[1]See, also, Knuth v. Murphy, 237 Minn. 225, 54 N. W. (2d) 771.

He further testified:

"Q. Will you state, Doctor, whether or not in your opinion it is most likely that the collision and the injury sustained in the collision is a probable cause of the disc?

＊　＊　＊　＊　＊

"A. Injury to a back of any nature is thought to be one of the causes of a ruptured intervertebral disc.

"Q. Is this history of the collision significant to you in this particular case with an absence of any other evidence of trauma?

＊　＊　＊　＊　＊

"A. Well, with nothing more to go on than the history it would certainly be highly suggestive that this accident was the cause of this lady's back troubles leading to a ruptured intervertebral disc."

Pressed for an answer based on a hypothetical question in which he was asked to assume certain facts, his answer was equally unsatisfactory. He then stated:

"Q. And what is your opinion?

"A. My opinion is that she received enough stress and strain at that time to give her these symptoms, which followed, the sequalae.

＊　＊　＊　＊　＊

"Q. What sequalae do you mean, Doctor?

"A. Sequalae means the things that follow, the sequence after an accident of this sort, which may include the symptoms, signs and the diagnosis."

On cross-examination, he admitted that the condition he found could have been the result of many other causes as well as the accident. He admitted further that his opinion was based on the history he obtained from plaintiff. In that respect he said:

"Q. ＊ ＊ ＊ what is it that leads you to trace that ruptured intervertebral disc back to a period two and a half years before—

"A. I have nothing but the patient's history to go on. I believe her and that is all I have to go on.

"Q. That is the point, you trace it back to that because of her history?

"A.   Because of her history, yes."

It is apparent from reading the testimony of Dr. Dobson that in his own mind he was not too convinced that the condition he found at the time of the trial was traceable back to the accident. At least, his testimony was not so convincing that the jury would be compelled to accept his opinion. It would be useless to recite in more detail the evidence on this phase of the case. It is enough to say that the evidence is not so conclusive on the issue of causal relationship between the accident and the physical condition of plaintiff which Dr. Dobson found upon examination of her some two and one-half years later that it presented only a question of law. The burden rested on plaintiff to prove the causal connection. The jury was justified in finding that plaintiff had not sustained her burden of proof.[2] The court having directed a verdict on the issue of negligence and contributory negligence in favor of plaintiff, it is obvious that the jury either found that the injuries which Dr. Dobson found at the time of the trial were not a result of the accident or found that plaintiff had failed to sustain her burden of proof on this issue; consequently, that there was no proof of damages traceable to the accident. Under these circumstances, the verdict was not perverse.

■   Plaintiff testified that the morning following the accident she was stiff and had severe headache and her back started hurting her. She said that sometime subsequent to the collision she went to see Dr. Howard of the Mankato Clinic who had been the family physician for a number of years. She testified that she told Dr. Howard that she was having backaches and advised him that she had been in an automobile collision. In the history given Dr. Dobson, who had never seen plaintiff until the first day of the trial, plaintiff stated that since the accident she noticed that she was prone to have a low backache and recurrent headache and that "She did see her local physician and mentioned it to him." At a pretrial deposition, plaintiff was asked about the condition of her health prior to the accident and answered: "I don't know, I imagine the doctor could tell you that better than I can." On further examination, she admit-

2Weinstein v. Schwartz, 204 Minn. 189, 283 N. W. 127.

ted that it was the doctors of the Mankato Clinic she had in mind in this answer.

The cases of Mr. and Mrs. Nelson were tried together. Defendant's counsel procured and served a subpoena duces tecum upon the Mankato Clinic, requiring them to produce the records regarding treatment of Mr. and Mrs. Nelson, and also issued a subpoena for the appearance of Dr. F. A. Baker, a chiropractor, who had treated Mr. Nelson for an injury prior to the collision involved in this litigation. During the trial, in chambers and outside the hearing of the jury, plaintiff's counsel informed the court and opposing counsel that he intended to assert the privilege of physician and patient against calling the attending doctors and the records of the Mankato Clinic. He moved to quash the subpoena duces tecum, which motion, after some argument, was granted by the court. After considerable legal skirmishing, plaintiff's counsel finally stated that he would withdraw any claim of privilege as to Dr. Baker for the reason that he was not sure whether the privilege applied to a chiropractor or not. Dr. Baker thereafter testified as to the prior treatment of Mr. Nelson. Plaintiff then was recalled, and the statements made by her in her pretrial deposition called to her attention. She was then asked whether, in view of the statement quoted above, she would now assert her privilege of physician and patient, and her counsel answered for her that she would.

In his argument to the jury, counsel for defendant referred on several occasions to his inability to produce the doctors who had attended plaintiff prior to the collision. The following statements are illustrative of such comments:

"* * * in a case of this kind it seems to me that what you jurors should be interested in more than anything else would be any records that you can obtain as to the history, as to the background, as to the physical condition of the plaintiffs in this case which would be of assistance to you in determining whether or not the present complaints are attributable to the accident which is here involved.

    *  *  *  *  *

"* * * I want you members of the jury to know that it is not within my power to give that information to you. Whether it is within the power of the plaintiffs or not to bring the records of the Mankato Clinic or the doctors of the Mankato Clinic to this court room is something about which we can only speculate or conjecture. But this I do say, that if it is possible for a neurologist to come from the City of Minneapolis with his records and with his X-ray reports, it should not be an insurmountable obstacle to provide this jury with information that today rests within four blocks of this court house in the records of the Mankato Clinic.

* * * * *

"The only thing that I ask you to do, members of the jury, is this: I do not ask you to indulge in any inferences against the plaintiffs because they assert privilege because the law is that you cannot do it, but what I do ask, members of the jury, is that you do not say to yourselves that if there was something between November 24th of '53 and June of 1956, or before November 24th of 1953, of importance in this case, that it was for Mr. Sheran to produce it, because I want you members of the jury to know that if I could produce it I would produce it, but, in the face of a plea of privilege I cannot."

It is apparent from the argument of counsel for plaintiff that he did exactly what defendant's counsel had anticipated he might do. By his argument it is clear that he attempted to leave the impression with the jury that failure to call the attending physician and to procure the records of the Mankato Clinic was attributable in some manner to defendant's counsel. Among other things, plaintiff's counsel said:

"* * * Did you see me asserting any privilege in behalf of these clients? Dr. Baker was here, and did you see me stand up and claim privilege? Did I claim privilege as to Dr. Baker? I sat here and I didn't say one word, I let him testify. * * *

* * * * *

"* * * The defendant has an absolute right under our law and under our practice to have these people, Mr. and Mrs. Nelson, examined by any doctor they want. They have a right to have physical

examinations and to bring those doctors, surgeons, orthopedists, specialists, any doctors they want to court, and did they bring one? And you know as well as I do why they didn't bring one, because they couldn't find one, because there wasn't a doctor that they could get that would tell a different story than the doctors that were here. * * *

* * * * *

"* * * I say to you, ladies and gentlemen, *that Mr. Sheran could have picked any doctors anywhere that he wanted to hire them,* and have them examine these people and bring them here to court, and he didn't bring one. And you can bet your life that if he thought there would have been *any doctor* that would have told a different story he would have had these people examined and would have had the doctor in court. * * *

* * * * *

"* * * And it is also correct, ladies and gentlemen, that he had a right to select *any doctor of his choice* and have him examine these people, and he didn't do it and he didn't bring any doctor into court.

"Why didn't he have the doctors here? You know why and I know why, and I will leave that up to you as to why. Why did I object to having the records here? Because those records by themselves without the doctor don't tell the story, and there is a mighty good reason why the doctor is not here. I am not going to have a bunch of records misconstrued or have them here without a proper explanation by the doctor. And I want to say to you, ladies and gentlemen, you just decide for yourselves, when they have the right to pick their own specialists and have these people examined and have their doctor present, if they don't hire those doctors, have them at least examine them and have them here, you decide what the reason is." (Italics supplied.)

The court, at the request of plaintiff and with the consent of defendant, instructed the jury as follows:

"In this case the plaintiffs did not call the attending physicians at the Mankato Clinic. The failure to call these doctors does not

allow you to presume or to infer that the testimony of these doctors would have been unfavorable to the plaintiffs."

Plaintiff contends that it was prejudicial error to permit defendant to require plaintiff to assert the privilege in the presence of the jury and also to permit defendant's counsel to refer to plaintiff's assertion of the privilege in his argument to the jury.

There probably is no privilege in the field of evidence so abused as the physician-patient privilege. This privilege did not exist under the common law.[3] In 1828, New York first established the privilege by statute,[4] which became the forerunner of statutes adopted in about two-thirds of the states. Seventeen states of the Union still maintain the common-law position denying any such privilege.[5] Our statute, M. S. A. 595.02(4), as far as pertinent, reads:

"A licensed physician or surgeon shall not, without the consent of his patient, be allowed to disclose any information or any opinion based thereon which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity; * * *."

At least to begin with, the purpose of the statute was to encourage full disclosure by a patient to his physician by prohibiting the physician from disclosing the information of a confidential nature which he obtained.[6] The basis of the privilege was the confidential nature of the communication.[7]

Instead of accomplishing the purpose for which it was originally intended, the privilege has been so far corrupted today that it is used, at least in personal injury cases, for the most part for suppression of the truth. McCormick, in his treatise on Evidence, § 108, p. 224, has been prompted to say:

[3]In re Estate of Koenig, 247 Minn. 580, 78 N. W. (2d) 364; McCormick, Evidence, § 101; 8 Wigmore, Evidence (3 ed.) § 2380.

[4]2 New York Rev. Stat. 1829, part 3, c. 7, title 3, § 73.

[5]Vanderbilt, Minimum Standards of Judicial Administration, p. 343.

[6]Snyker v. Snyker, 245 Minn. 405, 72 N. W. (2d) 357.

[7]See, 8 Wigmore, Evidence (3 ed.) § 2380a.

"* * * More than a century of experience with the statutes [dealing with physician-patient privilege] has demonstrated that the privilege in the main operates not as the shield of privacy but as the protector of fraud."[8]

We intend to cast no reflection on use of the privilege in this case by counsel for plaintiff. Throughout the years the privilege has been converted into a strategic device for the exclusion of evidence apt to be harmful to the case of the party having control of the evidence. As long as such use is approved, tacitly or directly, by the courts, it can be easily understood that counsel for a party litigant will avail himself of the right to use it to the best advantage for his client. He can hardly be criticized for so doing.

As far as the statute goes, it creates a right with which the courts have no right to interfere.[9] This case poses the question: How far shall the courts go in protecting an unfair advantage procured by one party to a lawsuit against his adversary by virtue of the privilege where plaintiff sues to recover for personal injuries and at the same time asserts the privilege which, theoretically at least, will keep secret the very injuries for which he seeks to recover damages? Under these circumstances, shall the court permit the jury to infer, if it chooses to do so, that his adversary was responsible for not producing the attending physician, or is it more in

[8]In a Report of the Committee on Improvements in the Law of Evidence to the Section of Judicial Administration of the American Bar Association, the committee had this to say:

"* * * The purpose of the statute [creating physician-patient privilege] was mainly to conform to the physician's ethical canon of secrecy, on the theory that the personal privacy of the patient's body was entitled to be respected. And yet the odd thing about the privilege is that it is usually invoked to protect from disclosure a bodily condition which has not been kept secret at all from friends and neighbors, and which only the tribunal of justice must not learn about. In personal injury claims particularly is the privilege ridiculously incongruous; for the plaintiff comes into court alleging a specific injury and then refuses to let the court listen to testimony concerning that injury." Vanderbilt, Minimum Standards of Judicial Administration, pp. 558, 578.

[9]Snyker v. Snyker, 245 Minn. 405, 72 N. W. (2d) 357.

line with the administration of justice to put the blame where it belongs—on the party asserting the privilege? The authorities are hopelessly divided on the question of whether opposing counsel may comment on the failure of plaintiff to call the attending physician[10] and on the question of whether the party claiming the privilege may be required to do so in the presence of the jury.[11]

In Minnesota, we have not passed on the precise question involved here, but we have had occasion to comment on related questions. In Merrill v. St. Paul City Ry. Co. 170 Minn. 332, 335, 212 N. W. 533, 534, we held that it was not error to refuse to instruct the jury that plaintiff's failure to call certain doctors to whom plaintiff had first gone for an examination permitted the jury "to indulge in the presumption that the testimony of the attending physicians if introduced would not have been favorable to * * * plaintiff's contention as to the nature and extent of the injuries he alleges resulted by reason of said accident." With respect to the right of defendant's counsel to comment on plaintiff's failure to call such doctors, we said (170 Minn. 336, 212 N. W. 534):

"* * * Without a direct instruction from the court relative to such absent witnesses, defendants' advocate has an opportunity to make an effective argument to the jury concerning such failure of plaintiff. Ordinarily the permissible argument to the jury would be more favorable to defendant than to have such witnesses called."

In the related field involving a privilege of husband and wife (M. S. A. 595.02[1]) we have had occasion in two cases to consider a question similar to the one now before us. In State v. Roby, 128

---

[10]Annotation, 116 A. L. R. 1170; 53 Am. Jur., Trial, § 477; 31 C. J. S., Evidence, § 157; 88 C. J. S., Trial, § 185; compare, for instance, Vergin v. City of Saginaw, 125 Mich. 499, 84 N. W. 1075, and Griggs v. Saginaw & Flint Ry. Co. 196 Mich. 258, 162 N. W. 960, with Howard v. Porter, 240 Iowa 153, 35 N. W. (2d) 837, and Meyer v. Russell, 55 N. D. 546, 214 N. W. 857.

[11]McCormick, Evidence, § 81, note 1; Annotation, 144 A. L. R. 1007; compare State v. Booth, 121 Iowa 710, 97 N. W. 74, and McConnell v. City of Osage, 80 Iowa 293, 45 N. W. 550, 8 L. R. A. 778.

Minn. 187, 150 N. W. 793, defendant was convicted of the crime of carnal knowledge. As stated in our opinion, the following action of the county attorney was claimed to constitute prejudicial error (128 Minn. 190, 150 N. W. 794):

"* * * before defendant was indicted, having employed counsel, he served upon the county attorney a notice in writing, in which he objected to the taking of any evidence of his wife 'either before the grand jury or elsewhere or otherwise.' After the state had closed its case, the county attorney asked permission to reopen it, and said: 'I would like to call Mrs. Roby.' Objection was made that she was incompetent. The court said: 'She is competent, but she is excluded from testifying without his consent; if you do not consent to it, she cannot testify.' Defendant's counsel again objected. The county attorney then said: 'I guess that is true * * * as long as there is objection to it, she cannot testify because she is his wife.' Thereupon defendant's counsel excepted to the offer as improper and prejudicial, and asked 'that the jury be instructed as to that.' It is contended the offer to call Mrs. Roby was such misconduct as to warrant setting aside the verdict of the jury."

We recognized the great diversity of opinion regarding the proper procedure where one party may desire testimony as to which the other party is entitled to claim privilege and regarding the right of comment by one party in case the privilege is asserted. We expressly considered McConnell v. City of Osage, 80 Iowa 293, 45 N. W. 550, 8 L. R. A. 778, which is one of the cases principally relied upon by plaintiff here, and refused to follow it. With respect to the right of a party under these circumstances to call a witness whose testimony may be privileged, we said (128 Minn. 191, 150 N. W. 795):

"* * * As applied to the facts of this case, we think the proper rule is stated by Wigmore as follows: That 'the party desiring to compel the spouse to testify may at least call for the testimony, and is not to be deprived of it until the party-spouse formally objects and claims the privilege' (3 Wigmore, Evidence, § 2244), and we believe this procedure has been usually followed in this state.

"It is claimed the previous notice of defendant advised the county attorney that consent was withheld, and rendered his conduct wrongful. Precedent will not aid us much in determining the effect of this notice, for it is quite unusual for a person to make objection to testimony which may be offered to prove a crime against him, on the ground of privilege or otherwise, before he has been indicted of any offense. But we think the effect of the notice should not be held such as to make it misconduct for the state to proceed in the usual way. The court might properly enough have instructed the jury that the objection of the defendant to the testimony of his wife should not weigh against him, but we cannot hold that the failure to do so was error."

In State v. Virgens, 128 Minn. 422, 151 N. W. 190, defendant was convicted of the crime of murder in the first degree. Defendant took the stand and, in an attempt to prove an alibi, testified that during the night of the crime he was at home continuously in the presence of his wife. By cross-examination of the state's witness Reim and by defendant's direct examination, defendant's counsel sought to show that criminal intimacy existed between defendant's wife and Reim, that Reim might be the murderer, and that it would serve the dark desires of the two to fasten the crime upon defendant. This was an attempt to justify the nonproduction of the wife as a witness and to leave the impression with the jury that defendant was the victim of an atrocious plot. In this situation, the state, by failing to request the consent of defendant to use his wife as a witness, would have admitted defendant's aspersions. In opening the case to the jury, the county attorney stated that the state would prove that defendant had told Reim that defendant's wife had told the county attorney everything she knew. Reim so testified without objection and was not contradicted by defendant. In his closing argument, the county attorney said (128 Minn. 431, 151 N. W. 193) :

"* * * 'The defendant tells you that he was home on the night of May 7. Now, gentlemen, there are only two persons who know whether he was home or not. He was living there alone with his wife. He has gone on the stand and given his testimony. We would like to

have had the testimony of the other person who was there and knows whether he was home or not.' "

The defendant accused the prosecuting attorney of misconduct with respect to this procedure. We said (128 Minn. 430, 151 N. W. 193) :

"* * * We have lately held in State v. Roby, supra, page 187, 150 N. W. 793, that it was not reversible error to permit the state to request the defendant in a criminal prosecution to consent to his wife testifying. The case at bar is much stronger. Indeed, the course defendant and his counsel pursued made it permissible, if not almost imperative cross-examination, to ask defendant whether he would consent to the state placing his wife upon the witness stand.

"* * * We have already considered the cross-examination of the defendant, revealing the whereabouts of his wife and his claim that he was with her when the homicide occurred, proper; that being so, the remarks quoted are not outside the record. In addition to the authorities cited in State v. Roby, supra, sustaining the course pursued by the county attorney we may give, Wharton, Criminal Evidence (10th ed.), § 435a, where it said 'where the wife of accused is by statute made a competent witness, comment may be made on his failure to call her.' The wife is not rendered incompetent by reason of our statute * * *."

Probably one of the best statements of the rule permitting comment is found in McCooe v. Dighton, S. & S. St. Ry. Co. 173 Mass. 117, 119, 53 N. E. 133, 134, where the court, speaking through Mr. Justice Holmes, said:

"* * * In a civil case, if one of the parties insists upon his privilege to exclude testimony that would throw light upon the merits of the case and the truth of his testimony, we are of opinion that it is a proper subject for comment. * * * This being so, it was proper for the court to compel the plaintiff to take the full responsibility of the choice."[12]

---

[12]See, also, Phillips v. Chase, 201 Mass. 444, 87 N. E. 755. For a good discussion of the entire subject, see McCormick, Evidence, §§ 80, 81.

The opposite view is expressed in William Laurie Co. v. McCullough, 174 Ind. 477, 483, 90 N. E. 1014, 1016, where the court said:

"* * * in the legislative judgment the considerations of public policy and general advantage to mankind from the establishment of inviolable confidence between physician and patient outweigh the private interests of any particular litigant. * * * the exercise of this privilege cannot be impaired by allowing opposing counsel in argument to impugn his motives * * *."

Of course, the above is true where the privilege is asserted for the purpose of keeping secret the information acquired by the doctor in examining or treating the patient, but can the facts learned by the doctor be kept secret when plaintiff sues to recover for the very injuries he claims a right to keep secret? It is then incumbent upon plaintiff to prove the nature and extent of his injuries. In doing so, he cannot at the same time keep secret the nature and extent thereof.[13] As far as the statute gives him a right to close the mouth of the doctor we cannot interfere. And as long as the privilege is asserted for the purpose for which it was created, it should be given full respect. But when it is asserted for the sole purpose of gaining a strategic advantage over an opponent and accomplishes nothing pertinent to the purpose for which it was created, it should not be further extended by judicial decision. If it is so used, it is only fair that the jury be permitted to know who was responsible for keeping out the evidence most likely to establish the truth. The blame, in that case, should be put where it belongs, not left so that the jury can, perchance, accuse the wrong party of failing to call the doctor. We therefore now hold that, when a physician-patient privilege is asserted by a party to an action seeking recovery for personal injuries and the nature and extent of the injuries are involved, it is

[13]This proposition is recognized in A. L. I., Model Code of Evidence, Rule 223 (3) ; see, also, McCormick, Evidence, § 106; 8 Wigmore, Evidence (3 ed.) § 2389 (2), where the author said:

"* * * Certainly it is a spectacle fit to increase the layman's traditional contempt for the chicanery of the law, when a plaintiff describes at length to the jury and a crowded court-room the details of his supposed ailment and then neatly suppresses the available proof of his falsities by wielding a weapon nominally termed a privilege."

not error to require the one asserting the privilege to do so in the presence of the jury or to permit fair comment by the adverse party on his inability to examine such attending physician concerning his examination and treatment of the patient.

Plaintiff cites in support of her position 19 Dunnell, Dig. (3 ed.) § 9799(4), and, among others, Braseth v. Farrell, 176 Wash. 365, 29 P. (2d) 680. Apparently plaintiff confuses the rule applicable to evidence excluded under the rules of incompetency and evidence excluded by assertion of a privilege. Where evidence is excluded by the court under rules rendering it incompetent, it is clear that no comment can be permitted.[14] Such evidence is excluded because it is deemed untrustworthy or not the best evidence available or due to the fear that the jury might be improperly influenced by it. On the other hand, evidence excluded by assertion of a privilege is not incompetent and frequently is the best evidence to establish the truth of the issue involved. But it is excluded because a witness (not necessarily a party to the litigation) has the right to prevent its production. The distinction is aptly stated in McCormick, Evidence, § 105,[15] as follows:

"* * * the rule which excludes disclosures to physicians is not a rule of incompetency of evidence serving the end of protecting the adverse party against unreliable or prejudicial testimony. It is a rule of privilege protecting the extrinsic interest of the patient and designed to promote health not truth. It encourages free disclosure in the sick-room by preventing such disclosure in the courtroom. The patient is the person to be encouraged and he is the holder of the privilege."

Consequently, the authorities pertaining to the right to comment on evidence excluded under rules of incompetency are of no value here.

We find no reversible error.

Affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.

---

[14]Minneapolis-St. Paul Sanitary Dist. v. Fitzpatrick, 201 Minn. 442, 277 N. W. 394, 124 A. L. R. 897; 19 Dunnell, Dig. (3 ed.) § 9799(4).

[15]See, also, Id. § 72.