**Carole F. RUPPERT, Appellant,**

v.

**MILWAUKEE MUTUAL INSURANCE COMPANY, Respondent.**

No. C2–86–45.

Court of Appeals of Minnesota.

Aug. 19, 1986.

Review Denied Oct. 22, 1986.

Robert F. Mannella, Babcock, Locher, Neilson and Mannella, Anoka, for appellant.

Bruce A. Webster, Richard Baldwin, Webster & Baldwin, P.A., St. Paul, for respondent.

Heard, considered and decided by LESLIE, P.J., and FOLEY and WOZNIAK, JJ.

## OPINION

FOLEY, Judge.

Carole Ruppert sued her no-fault insurer, Milwaukee Mutual Insurance Company, a Wisconsin corporation, for basic economic loss benefits, *see* Minn.Stat. § 65B.44 (1984), for expenses incurred after April 30, 1981 as related to back and neck injuries she suffered in a December 1980 rear-end motor vehicle collision. Milwaukee Mutual paid for expenses incurred by Ruppert before April 30, 1981, and then refused further payment. Following a trial before the court, the court granted judgment for Milwaukee Mutual. Ruppert moved for amended findings or a new trial, claiming the trial court erred and its decision was contrary to the testimony of her treating physicians who stated that she required continuing medical care and treatment as well as replacement services because of the injuries she sustained in the December 1980 car accident. The trial court denied these motions and Ruppert appeals from this order and the judgment. We reverse.

## FACTS

On December 19, 1980, Carole F. Ruppert stopped her Ford LTD station wagon at a controlled intersection on Highway 65 as the semaphore turned yellow. Her vehicle was then struck in the rear by a pickup which was estimated to be traveling at a speed of 35 to 50 miles per hour. Ruppert's vehicle sustained substantial rear-end damage, and her car seat was broken as the pickup pushed the car across the intersection. Ruppert experienced immediate neck and back pain. She was transported to North Memorial hospital by ambulance where she was examined, x-rayed and released.

Ruppert continued to have back and neck discomfort in the ensuing days. She described her pain as a strangling, choking sensation in her chest which prevented her from working in her husband's business or around the house. She saw her family physician, Dr. John Giebenhain, on December 23, 1980 because of her pain. Medical records indicate that Dr. Giebenhain diagnosed her problem as myofascial strain of her neck and back and referred her to Dr. Richard G. Sletten, an orthopedic surgeon.

Dr. Sletten's medical records indicate that between mid-January 1981 and April 30, 1981, he examined Ruppert three times and spoke with her by telephone another three times about her neck and back pain, headaches, and aching in her right arm and leg. He initially diagnosed her problem as myofascial strain of the cervical, dorsal and lumbar spine, and contusion of the left tibia and overlying skin. He prescribed Motrin, heat and rest and recommended one day per week household help.

When she returned for treatment in March because of increased pain and because her chiropracter recommended she see a specialist for a possible disc problem,

Dr. Sletten made the same diagnosis and, in addition, noted radicular type symptoms on an intermittent basis into the right upper and right lower extremities. Physical therapy along with cervical traction, Motrin, heat, massage and ultrasound were prescribed to treat her neck and back. Ruppert called several times with complaints of increased pain and was referred to a neurologist for evaluation of her complaint of pressure in her head and shoulder.

Based on Dr. Sletten's referral, Ruppert was examined by Dr. C. Camak Baker, a neurologist, in April 1981. His report indicates that he found no evidence of neurologic lesions upon examining Ruppert but believed there was a functional aspect to some of her pain. He assured her that he saw no evidence of permanent damage. She sought no further treatment from Dr. Baker, although he offered to see her again if she did not improve.

Despite Ruppert's continuation with the prescribed treatments, she experienced severe pain, especially with increased household cleaning. In discussing her situation with the physical therapist she was referred to, Ruppert determined that she should be resting her body more and receiving more household help in order to recuperate. She called Dr. Sletten's office in late April 1981 to request additional household help. His office notes indicate that she requested daily help with housecleaning and household duties. When she was told this could not be done, she decided to get a second opinion, explaining at trial that she had experienced no relief from pain while under Dr. Sletten's treatment and that she did not think that he had her best interests in mind in refusing additional household help. Ruppert did not schedule future appointments with Dr. Sletten.

After Ruppert discontinued seeing Dr. Sletten and commenced treatment with other physicians, Milwaukee Mutual ceased paying for any of her medical bills or replacement services. Dr. Sletten's records do not explain this decision; in fact, Ruppert was due for a six-week check-up in early May. However, she did not keep this appointment.

Aware of her dissatisfaction with Dr. Sletten, Ruppert's attorney recommended that she see his own physician, Dr. Paul Patterson, an orthopedist. Ruppert testified that on her first visit to Dr. Patterson on May 18, 1981 (for evaluation of her low back—not neck pain), she was experiencing low back pain, pain in her right hip, pain extending down her right leg and back pain that felt like something was screwing into her back. Dr. Patterson examined her and observed that she had abnormal leg raising (straight leg raising of 45 on the right and 70 on the left, showing muscle tightness that is generally thought to be related to nerve root irritation), decreased sensation in her right leg and reflex changes in her right leg (both also possibly indicative of nerve root pressure). Dr. Patterson decided that Ruppert had a disc syndrome which could be a ruptured disc or something similar causing nerve irritation such as stretching injuries to the nerves. He recommended immediate hospitalization for further evaluation, including evaluation by a neurologist for her neck problem, a CAT (computerized axial tomography) scan of the lower back and a myelogram of the lumbar and cervical areas. Dr. Patterson also prescribed bed rest, traction and heat treatment.

Ruppert was hospitalized on May 18 and discharged on June 1, 1981. During this time, Dr. Steven Noran, a neurologist, was called in by Dr. Patterson to evaluate and treat her neck and shoulder pain and headaches. At the time Dr. Noran examined Ruppert, she experienced pain on her right side radiating into her shoulder blade and right arm and severe headaches unlike any she had experienced before her accident (in addition to her low back and leg pain). Dr. Noran noted cervical muscle spasms and tenderness in her right shoulder blade area; these continued at the time of her discharge. Dr. Noran testified at his deposition that he diagnosed her problem as cervical strain and radiculitis as well as lumbar strain and radiculitis or sciatica. It was his opinion that "the auto accident she

was in on 12–19–80 was the direct and most significant cause for the diagnoses" that he expressed.

Dr. Noran and Dr. Patterson continued to treat Ruppert after her discharge on a periodic basis. Dr. Patterson treated her back problems and Dr. Noran her neck problems. Ruppert testified that she felt better after the hospitalization but still continued to have neck, back, leg and arm pain. Both doctors also noted some improvement. Dr. Patterson noted in July 1981 that her back had improved so that her activity had increased, that her numbness was reduced in her right leg and that her right leg raising was 60 and her left leg was 70.

Dr. Patterson and Dr. Noran each prescribed a traction bed unit for her at-home use. Ruppert hooked herself up using the neck and low back traction units about six times a day in the months following her hospitalization. Dr. Patterson also prescribed a back brace and weight reduction. Subsequently, Dr. Noran also prescribed ultrasound massage, hot and cold packs, biofeedback training, and a TENS (transcutaneous electrical nerve stimulator) unit (prescribed to ameliorate symptoms). Both Dr. Patterson and Dr. Noran recommended during their course of treatment that Ruppert restrict herself from doing heavy housework because it aggravated her condition. Ruppert obtained household help for strenuous cleaning activities.

Dr. Patterson's diagnosis of Ruppert in September 1981 had not changed. He continued to prescribe weight loss, traction and the back brace. In January 1982, he learned she was returning the hospital bed because the insurance company would not pay for it. He felt it was "definitely helping." Therefore, upon her request, he prescribed the use of a waterbed since his experience had shown that about 85% of his patients with back problems obtained relief from sleeping on a this type of bed.

In February 1982, Dr. Patterson noted that although Ruppert had utilized the waterbed and was feeling better, she continued to have numbness. He further noted that the biofeedback prescribed by Dr. Noran helped her relax and that increased house cleaning caused her to experience numbness in her legs. Dr. Patterson labeled his continuing diagnosis of Ruppert as a disc syndrome and testified that the cause of her disc syndrome was the injury she sustained in the December 1980 car accident. He further testified at his deposition that he never believed Ruppert's complaints were "ingenuine."

On cross-examination, Dr. Patterson indicated he was not familiar with Ruppert's medical history before the accident, including her April 1979 accident in which her left leg was injured and chiropractic treatment over the previous nine years. On redirect, he indicated that his opinion as to the cause of her injuries was not changed by the knowledge she sought chiropractic treatment for a stiff neck and back following a road trip from California several days before the accident or by the fact she had low back pain during her pregnancies. Dr. Patterson did not treat Ruppert after February 1982 when he was injured and became unavailable for appointments. Ruppert did not consult another orthopedic surgeon but did continue seeing Dr. Noran.

Dr. Noran saw Ruppert every several months after her hospitalization in June 1981. He had a CAT scan performed again on April 23, 1982 which showed a bulging disc at C5–C6. Dr. Noran explained that if he could review the myelogram performed during her hospitalization in June 1981, he might interpret something with this knowledge in retrospect and, further, that the radiologist may have missed something in the earlier CAT scan so that this "cervical abnormality" pre-existed the April 1982 scan.

Dr. Noran also recommended additional physical therapy for Ruppert in August 1982 following a minor car collision. Dr. Noran testified that this minor collision also aggravated her "pre-existing condition that pre-exposed her and pre-disposed her to having an aggravation of that condition." He believed that she returned to her previous physical state after therapy.

Again in April 1982, physical therapy was prescribed for two months to treat Ruppert's pre-existing condition which Dr. Noran testified was aggravated by her stretching in the shower.

Dr. Noran continued to see Ruppert several times a year up to the time of trial in 1985. On her last visit with him on June 4, 1985, she told him about all her prior injuries and accidents occurring before the December 19, 1980 accident. He was not previously aware of this history but could not be sure he had asked her for this information during the first consultation. At his deposition taken after this visit, he recalled that Ruppert had told him that the headaches she experienced after the accident and for which she sought continuing treatment were unlike any she had before the accident in both severity and character. Dr. Noran indicated that he would have preferred knowing of any prior accidents and chiropractic treatments for headaches and neck pain before the December 1980 accident, but stated that review of previous x-rays "would not probably change much." Dr. Noran was asked a hypothetical question by Ruppert's attorney in which her previous neck and back pain and treatment by a chiropractor were described. In Dr. Noran's opinion, "the bottom line" did not change with this information and the injuries he treated were caused by the December 1980 accident.

Milwaukee Mutual retained Dr. Mark Sigmond, an orthopedist, to perform a physical examination of Ruppert on February 10, 1982 (almost one year after Milwaukee Mutual had ceased paying her bills), to determine her ability to work as a bookkeeper and assist in her husband's well-drilling business (claims for lost wages were withdrawn at trial), as well as her inability to perform normal household chores. He was not retained to determine whether the medical expenses she had incurred were reasonable and necessary. Dr. Sigmond recalled five complaints Ruppert made: (1) headaches in the back portion of the head, radiating to the top, (2) neck stiffness and soreness, (3) numbness, pain and a cold feeling in the right arm, (4) low back pain, and (5) right leg symptoms, including aching and intermittent numbness. Based on his examination and findings, Dr. Sigmond diagnosed a cervical and lumbar strain with ongoing mechanical low back pain without evidence of radiculopathy (sign of pressure on a nerve root impairing its function). He noted minimally restricted right leg raising, among other things, and concluded that:

> [T]he patient might have difficulty with repetitive heavier lifting and chores such as vacuuming. I felt, however, that her complaints were somewhat in excess of her physical findings. I felt that she could reasonably be expected to perform the normal duties of a bookkeeper, that she could be expected to lift 25 pounds several times a day, but might require assistance to lift weights in excess of 50 pounds. I felt that she could reasonably be expected to have complaints of increased back and neck discomfort with household activities such as vacuuming, washing windows and walls, et cetera, but I was not certain that complaints at that time were sufficient to justify prolonged household help.

Dr. Sigmond further indicated that "I guess I feel I couldn't rule out a very minimal disability, but it would be hard to be more specific." He further noted that his review of Dr. Sletten and Dr. Baker's reports did not change his opinion.

With regard to Ruppert's prior chiropractic treatment for occasional headaches and low back pain and a car accident she was in when she was 16, Dr. Sigmond concluded:

> At this point I would not anticipate further hospitalization. I would not anticipate surgical treatment. *I think that it would be reasonable for her to be followed episodically by either an orthopedic surgeon or neurologist with usually home directed conservative modalities.* This could include home traction, home exercise program, weight loss, swimming and observing proper back mechanics and observing appropriate lifting, carry-

ing and body mechanic precautions. (Emphasis supplied.)

Finally, Dr. Sigmond concluded that the type of accident that Ruppert was involved in on December 19, 1980 was capable of causing the type of injury she received.

Dr. Wilke, a chiropractor who treated Ruppert for occasional back and neck pain he attributed to muscle or tension-related problems on 47 occasions over a nine-year period prior to the December 19, 1980 accident, described her headaches as "synonymous" with "cervical tension." He also treated her in April 1979 following a car accident in which she was rear-ended by another car. Ruppert testified that although her left leg was injured in this accident, she recovered with the chiropractic treatments that spring and sought no further treatment.

Immediately before the December 19, 1980 accident, Ruppert was also treated by Dr. Wilke. On December 15 and 17 he treated her for neck and low back pain following her trip to and from California in a large truck. Ruppert explained that this trip was made in 10 days and that since the truck had no running board, climbing up into the seat caused her low back discomfort. She stated that the treatments from Dr. Wilke took care of this discomfort and that she was experiencing no such pain the day of the December 19, 1980 car accident.

After her December 1980 accident, Dr. Wilke saw Ruppert on December 31, 1980, February 9, 17, and 26, and March 9, 1981 for the pain she suffered following the December 1980 accident. At the March visit, Dr. Wilke advised Ruppert to consult either a neurologist or orthopedist since he suspected she had suffered a cervical intervertebrae disc problem from the accident, something he had not observed before this accident. Ruppert did not receive treatment from Dr. Wilke after this date but reported to Dr. Sletten what Dr. Wilke had told her. Dr. Wilke also testified that the headaches he had treated Ruppert for following her December 1980 accident were unlike the previous tension-related headaches for which he had treated her.

Following a trial before the court, in which the depositions of several of the physicians were admitted as evidence and the relevant medical records were admitted except for opinions they contained, the trial court denied Ruppert's claim for medical expenses, transportation expenses, household help and the interest penalty, noting that all bills before April 30, 1981 had been paid.

The trial court denied appellant's subsequent motions for amended findings or a new trial and this appeal followed.

## ISSUE

Did the trial court err in denying Ruppert no-fault medical benefits, replacement services and medical transportation expenses incurred after April 30, 1981, despite her physicians' testimony that medical treatment after that date was required for the injuries she sustained in a December 19, 1980 car accident?

## ANALYSIS

*Standard of Review*

Since this case was heard without a jury, the trial court was required to "find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment." Minn.R. Civ.P. 52.01. The key issue at trial was whether Ruppert's neck and back injuries were proximately caused by the December 19, 1980 car accident. "Ordinarily a finding of proximate cause is reserved to the jury." *Kenney v. Chicago Great Western Railway Co.*, 245 Minn. 284, 290, 71 N.W.2d 669, 673 (1955). Therefore, we must determine whether the court's finding is clearly erroneous. *See* Minn.R.Civ.P. 52.01.

*Trial court findings and conclusion*

Here, the court's decision that Ruppert was not entitled to no-fault benefits for expenses incurred after April 30, 1981 was based on an implicit finding that the injuries for which she received treatment after that date were not proximately caused by

the December 19, 1980 accident. In determining whether proximate cause has been proven:

> The test, of course, is not whether the trauma resulting from another's negligence might, only in the realm of possibility, have been a factor in producing a certain result, but whether it was a factor or at least a probable factor in producing the claimed result.

*Kenney*, at 290, 71 N.W.2d at 673, *quoting Berg v. Ullevig*, 244 Minn. 390, 398, 70 N.W.2d 133, 138 (1955). The trial court does *not* make an explicit finding that Ruppert was cured after April 30, 1981 and thus required no further treatment for her car accident-related injuries or that she received treatment for a pre-existing condition.

The trial court's findings include a review of her medical treatment following the accident and the diagnoses of the physicians. The court noted that neurologist Dr. Baker found no evidence of neurologic lesion, no neurological findings and no permanent damage. The court found that benefits were denied "effective as of plaintiff's last treatment with her private physician, Dr. Richard Sletten on April 30, 1981," and that this treatment ceased because he refused to approve daily household help. All treatment received before April 30, 1981 was paid for by Milwaukee Mutual. The court found that Ruppert then commenced treatment with Dr. Patterson because "she was referred to the doctor by her attorney," and that when hospitalized her CAT scan and myelogram produced negative findings. The court further noted that a positive finding by Dr. Noran made in April 1982, "could have occurred prior to December 19, 1980 or thereafter and there is insufficient evidence to find this to be an objective finding resulting from the accident." The court also concluded that "all neurological findings from all examiners were negative therefore minimizing the importance of this finding."

Finally, the court found that the plaintiff had the following medical history and accident history:

1) 1959: car accident wherein she injured her right side and shoulder which injury lasted for a few years.

2) September, 1971: car accident.

3) September 23, 1978: North Clinic—back pains.

4) April 9, 1979: Osseo car accident—hurt leg.

5) May 4, 1981: treatment for headaches and left sacollac [sic] pain and neck aches.

6) August 13, 1980: North Clinic—pain in right back area.

7) August 15, 1980: North Clinic—full range of motion of back, five disc no CDA tenderness, prescribed heat, rest and continue norgesic with HCT.

8) California Trip, chiropractic care immediately before accident of December 19, 1980 for low back pain.

9) Plaintiff's chiropractor Dr. Wilke's reports dated May 4, 1981 and January 5, 1982 show that he treated plaintiff from February 25, 1967 through September 8, 1976, 47 treatments over a period of nine years for low back aches, headaches and occassionally a shoulder problem and again on April 9, 1979 when she was injured in a rear end accident involving her left leg with some cervical derangement causing neck aches and headaches. He treated her additionally 4 treatments on April 10, April 30, December 15, 17 for these injuries. Furthermore, Dr. Wilke, the chiropractor, treated plaintiff for care and treatment of neck and low back pain on December 17, 1980 and December 15, 1980 two and four days prior to the date of the accident December 19, 1980.

One must *infer* that the court concluded that Ruppert's neck and back problems predated the December 19, 1980 accident or that since no objective tests could substantiate her pain, her treatment after April 30, 1981 was unnecessary. No such explicit findings were made and the record does not support the court's apparent inferences. As we noted in *Rud v. Flood*, 385 N.W.2d 357, 361 (Minn.Ct.App.1986), soft tissue injuries are difficult to substantiate

with objective evidence. This does not mean such injuries are not real and do not require medical treatment. Dr. Patterson testified that he never doubted the genuineness of Ruppert's complaints, and Dr. Baker noted a functional aspect to some of her pain. Limited leg raising, muscle spasms and other indicators of some dysfunction were observed in Ruppert, along with her ongoing pain. Dr. Noran described her problem as a disc syndrome indicating nerve damage which he explained could be difficult to document.

All physicians who treated Ruppert, and her chiropractor, testified that the injuries for which they treated her or the symptoms they observed in her were caused by the December 19, 1980 accident. Although Dr. Sletten stopped treating Ruppert after April 30, 1981, this cessation of treatment occurred because Ruppert sought care from another physician. Dr. Sletten was not deposed and did not offer his medical opinion at trial regarding the cause of Ruppert's injuries. His records indicate, however, that he expected to see Ruppert six weeks after their late-March visit. Such a visit would have occurred in May, after the court's apparent cut-off date.

As appellant notes, the trial court cannot simply ignore the physicians' testimony.
"The rule is well established in this state that the court or jury cannot disregard the positive testimony of an unimpeached witness unless and until its improbability or inconsistency furnishes a reasonable ground for so doing, and this improbability or inconsistency must appear from the facts and circumstances disclosed by the record in the case. It cannot be arbitrarily disregarded by either court or jury for reasons resting wholly in their own minds and not based upon anything appearing on the trial." *O'Leary v. Wangensteen*, 175 Minn. 368, 370, 221 N.W. 430, 431.

*Cormican v. Anchor Casualty Co.*, 249 Minn. 196, 201, 81 N.W.2d 782, 786–87 (1957) (footnote omitted). The rule in *O'Leary* was modified in later cases to allow a jury to disregard:

[T]he positive testimony of a witness, although he is not contradicted by other witnesses—
" * * * if his testimony is impeached and made improbable by reasonable inferences drawn from the surrounding physical facts and circumstances as disclosed by the record." *Knudson v. Nagel*, 238 Minn. 186, 191, 56 N.W.2d 420, 423.

*Nelson v. Ackermann*, 249 Minn. 582, 585, 83 N.W.2d 500, 502 (1957).

This case is not like *Rud*, where we affirmed a jury finding that the plaintiff did not suffer permanent injury from an accident contrary to the unanimous testimony of two physicians. In *Rud*, we noted that the record supported the jury's finding, despite physicians' testimony of permanence, because the physicians' conclusions were inconsistent with plaintiff's symptoms, the physicians' observations and plaintiff's post-accident lifestyle.

The court here apparently decided that Ruppert's failure to mention her previous chiropractic treatments and her April 1979 car accident to her treating physicians prevented them from accurately determining that the December 1980 accident caused her injuries. However, this finding ignores the testimony of Dr. Patterson and Dr. Noran who indicated on redirect examination that this information did not change their conclusion that her injuries were caused by the December 1980 rear-end collision. Dr. Sigmond, hired by Milwaukee Mutual to perform an adverse physical exam, was aware of most of Ruppert's significant prior history and concluded that her injuries were consistent with the December 1980 accident. Ruppert explained that she did not volunteer all her history to her treating physicians because she had fully recovered from any prior neck or back pain for which she had sought treatment and the current pain for which she received treatment occurred only after the December 1980 accident.

The evidence shows that Ruppert's pre-accident treatments with her chiropractor were sporadic. Although she testified to

suffering a minor injury to her left leg in April 1979 when her car was rear-ended while stopped at a curb, she did not seek treatment from a physician and did not seek ongoing care or treatment as she did with the December 1980 accident. She only saw her chiropractor a few times for her leg injury. Ruppert was also treated by her chiropractor several days before her December accident but neither she nor the chiropractor believed she had any kind of physical injury or chronic problem at this point. Only after she sought numerous treatments from the chiropractor following her December 1980 accident did the chiropractor determine that she had a disc problem and needed the attention of a physician, either a neurologist or orthopedist.

Ruppert's other treatments from the chiropractor were explained as muscle or tension related, not accident related. She testified that the pain she sought treatment for subsided with a treatment from Dr. Wilke until after the December 1980 accident. The pain following that accident was much more severe, a burning sensation that disabled her from doing bookwork and heavy household cleaning for a substantial period of time. She also indicated that she never previously suffered numbness in her right leg or arm and that the headaches she suffered after the accident were unlike any she had suffered before.

Likewise, her visits to the North Clinic do not indicate a chronic problem or any similarity with the symptoms she experienced after the December 1980 accident. For example, the records show one episode of back pain was related to a severe cough she sought treatment for, while another incident was related to wallpapering and did not produce an injury or require subsequent treatment. The testimony of Ruppert's physicians and chiropractor is supported by the record and was not made improbable by any reasonable inferences which might be drawn from the record.

### DECISION

The trial court's findings do not support its conclusion that Ruppert is not entitled to the basic economic loss benefits she seeks to recover. The evidence only supports one conclusion, that Ruppert is entitled to receive the expenses she proved at trial in addition to the interest penalty provided for under Minn.Stat. § 65B.54, subd. 2 (1984).

Reversed.