STATE OF IOWA v. C. V. SMITH, Appellant.

**Abortion: ACCOMPLICE:** *Corroboration.* The woman upon whom an abortion has been committed, is not the accomplice of the person committing the abortion, so as to require her testimony to be corroborated, to warrant a conviction.

**Privileged Communication: DOCTORS.** Communications from one physician to another, made to secure the aid of the latter, in the commission of an abortion, are not privileged.

**Refreshing Memory of Witness: OFFICIAL SHORTHAND REPORT.** A court stenographer may testify from his shorthand notes, as to the testimony on another trial, though, independent of such notes, he has no knowledge of such testimony.

**Refusing to Recall Witness: WAIVER BY.** Defendant, by refusing to recall a witness after the state has withdrawn its objections to his testimony, waives any error in the rejection of such testimony.

**Coercion of Jury: NEW TRIAL.** That a rumor reached the jury at four o'clock on Saturday afternoon, after they had been out twenty-five hours, that the presiding judge was going away at noon on the following Monday, and that they would be held together until Monday, unless they agreed sooner, will not require a new trial, where it is not shown that they were influenced thereby.

*Appeal from Polk District Court.*—HON. S. F. BALLIET, Judge.

FRIDAY, OCTOBER 9, 1896.

THE defendant was indicted, tried, and convicted of the crime of producing a miscarriage of a pregnant woman, namely, Ollie Newman, and judgment of imprisonment in the penitentiary pronounced against her, from which judgment she appeals.—*Affirmed.*

*W. H. McHenry* and *L. Kinkead* for appellant.

*Milton Remley,* attorney general, and *Jesse A. Miller* for the state.

GIVEN, J.—I.  The following statement of facts that appear in the record will make plain the questions to be considered:  On and prior to September 24, 1893, the defendant, Mrs. C. V. Smith, resided in the city of Des Moines, and was engaged in the regular practice of medicine.  On said day Ollie Newman, an unmarried woman, aged twenty-three, residing at the town of Swan,—and with whom and her family the defendant had been intimately acquainted for many years,—came to the defendant for treatment. Ollie Newman was then advanced between five and six months in pregnancy.  She remained in the defendant's home, and under her care and treatment, for three weeks from and after said September 24. On the morning of September 25, the defendant commenced treating Ollie Newman.  On the morning of October 5, Ollie Newman had a miscarriage, and the controlling contention, is, whether the treatment she received at the hands of the defendant was intended to and did produce that miscarriage.  According to the testimony of Ollie Newman, she was, aside from

her pregnancy, in a sound, healthy condition at the
time she came to the defendant, and no attempt had
been previously made to produce a miscarriage. She
testifies that certain instruments and medicines were
used upon her by the defendant for the purpose of
producing a miscarriage, and that a miscarriage fol-
lowed their use. The defendant testifies that when
Ollie Newman came to her for treatment she was in a
deranged condition; "that the uterus was sore, swol-
len, and very much inflamed, and it looked like it had
been punctured in the mouth of it, and all around the
sides"; and that it was "tipped," the parts swollen,
and a discharge coming therefrom. She admits the
use of some kind of instruments named by Ollie New-
man, but she testifies that they were used in a differ-
ent way, and for a different purpose, from that stated
by her. She described the treatment which she
administered, and says it was proper treatment, under
the conditions, to prevent a miscarriage. Several
experienced physicians confirm her in this statement
as to the propriety of the treatment, under conditions
such as she states existed, while one or two others
condemn the treatment. On the fourth day of Octo-
ber, defendant found the head of the foetus in the
vagina, and that it had commenced to leave the
uterus; and believing that a miscarriage could not
then be prevented, and that the obstruction must be
removed, and having no instruments, she sent for Dr.
Maple. On coming, Dr. Maple refused to have any-
thing to do with the case. Defendant testifies that
Dr. Maple advised that nature be allowed to take her
course. It does not appear that after Dr. Maple's
visit, on the evening of the fourth, anything further
was done to either prevent or produce a miscarriage.
The miscarriage occurred on the morning of the fifth.

II. Appellant complains in argument of numer-
ous rulings of the court in taking the testimony, and,

in argument, refers to the motion for new trial as showing exceptions to the rulings. An examination of the abstract fails to show either objections or exceptions in many of these instances, and most of the objections urged in argument are to rulings that were manifestly correct, or without prejudice to the appellant. The following questions are so presented in the record as to require consideration; The state called Dr. Maple, for whom the defendant had sent on the evening of October 24, and who, after stating that he went to defendant's house on that evening, and that the defendant was there, was asked as follows: "Now you may state what you saw and did there in her presence." The question evidently refers to the defendant, Mrs. Smith, as no other person had been previously mentioned. The defendant objected on the ground "that the things he saw, and the conversation he had with this defendant, upon the occasion of the visit mentioned by him, were confidential, and that the knowledge he obtained upon that occasion was obtained in his capacity of a physician." The county attorney announced that Ollie Newman "waives any question of privilege, and consents that the testimony of the witness now on the stand may be fully given. I am authorized to say so, am I not?" Ollie Newman: "Yes, sir." The court ruled as follows: "Doctor, the ruling of the court is to this effect: That communications between you and the defendant, Mrs. Smith, are not privileged. It would not come under the head of privileged communications between a physician and a patient, and you can answer accordingly." Thereupon Dr. Maple testified as follows: "I went into the room, and took off my overcoat, and laid down my instruments. Mrs. Smith told me that she had a friend from the southern part of the state; that she came there to be treated; that she was in the family way, and was to be married to a man in

Pennsylvania, and must get out of this fix before she was to be married. She wanted that I should go into the room and examine the patient, and I refused to go. She told me that the girl was sick. I told her that I would have nothing to do with the case. I went into the other room, and put on my coat." Section 3643 of the Code is as follows: "No practicing attorney, counselor, physician, surgeon, minister of the gospel, or priest of any denomination, shall be allowed in giving testimony to disclose any confidential communication properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office, according to the usual course of practice or discipline. Such prohibition shall not apply to cases where the party in whose favor the same are made, waives the rights conferred." The communication testified to was not from Ollie Newman, nor did the relation of physician and patient exist between Dr. Maple and her, as the doctor declined to have anything to do with the case. The prohibition of said section, was therefore not in the favor of Ollie Newman, and she could not waive the same. The prohibition of the statute is not limited to communications with the patient, but applies to all communications of the character indicated in the statute, from whatever source, and is surely applicable, in all its force, to communications between physicians attending, or consulting, in the same case. The question is, whether the communication from the defendant, to Dr. Maple, testified to by him, was a communication properly intrusted to him, and necessary and proper to enable him to discharge his duties as a physician. In *State v. Kidd*, 89 Iowa, 56 (56 N. W. Rep. 263), we held that "professional communications are not privileged, when such communications are for an unlawful purpose, having for their object the commission of crime;"

citing 19 Am. and Eng. Enc. Law, 140, and cases
therein cited. See, also, 1 Wharton Ev. section 590;
*People v. Blakeley*, 4 Parker, 176; *Hewitt v. Prime*, 21
Wendel 79; *Campau v. North*, 39 Mich. 606; *State v. Hil-
mantel*, 23 Wis. 422; *Coveney v. Tannahill*, 1 Hill, 33.
It is evident, from the undisputed facts and testimony
of Dr. Maple, that the communication of the defend-
ant to him was for an unlawful purpose, and had for
its object the commission of a crime, and is therefore
not privileged, under the statute.

III. Dr. A. H. Young was called on behalf of the
defendant, and having stated that he was a physician,
that he had known Ollie Newman since 1891, and had
been called to treat her professionally in the early
part of 1892, was asked as follows: "For what did
you treat her?" The state objected as irrelevant and
immaterial, which objection was sustained; and there-
upon defendant's counsel stated that he offers to prove
by Dr. Young that he had consulted and treated Ollie
Newman in the year 1892; "that she came to him, and
upon examination he found upon the uterus certain
punctures and bruises, and that the uterus and vagina
were inflamed and swollen, and that there was more
or less discharge from it; that there followed a prema-
ture birth of the fœtus; and that, in his judgment as a
physician, that premature birth was caused by the
insertion of a certain wire instrument into the
mouth of the uterus." The county attorney
announced, "I am inclined, under the suggestion
of the court, to withdraw the objection, and let the
evidence go in, subject to the right to strike it out if
incompetent, and I offer to do so now." Thereupon
Mr. McHenry, counsel for defendant, said: "I have
got the offer in the record now, and I am not com-
pelled to seesaw back and forth all day. I have made
this offer, and it is upon the record, and I now decline
to call this witness for this purpose any more."

Whereupon the court announced: "The offer is denied, and the defendant excepts." The record shows that a lengthy colloquy followed between counsel, but it will be seen from what we. have said that defendant declined to call the witness after the state had withdrawn the objection, and must therefore be held to have waived the right to further examine Dr. Young. Counsel discuss at length the question of the admissibility of the proposed proof, but, under the record, we are not called upon to consider that question. Defendant's counsel having declined to further examine the witness, there was no prejudical error in denying the offer.

IV. C. F. Irish, official reporter of the court, was called upon the part of the state, and testified that he reported the *Weston Case*, including the testimony of Orange Drake, and of this defendant, given on that trial, and that he had his notes of that testimony before him. Mr. Irish was asked whether Orange Drake was inquired of on that trial as to the general reputation of Ollie Newman for morals. Thereupon, defendant's counsel inquired, "Mr. Irish, do you remember, independently of your notes, the transactions inquired about?" To this Mr. Irish answered, "No, sir; I do not." Mr. McHenry: "You have to depend entirely upon your shorthand notes?" "Yes, sir." Thereupon defendant's counsel objected, as immaterial, irrelevant, and incompetent, which objection was overruled, and Mr. Irish proceeded to testify to statements made by Orange Drake and by this defendant on the trial of Weston. Objections like this are of frequent occurrence, and seem to call for a definite statement of the rule applicable to such cases. It is sometimes said that, as the use of stenographic reports in the trial of cases is of modern origin, some new rule should be declared; but not so, we think, as a proper understanding of old and well-established rules

is plainly applicable to such questions. Mr. Greenleaf, in his work on evidence (section 436, 14th Ed.), states the rule, as follows: "Though a witness can testify only to such facts as are within his own knowledge and recollection, yet he is permitted to refresh and assist his memory by the use of a written instrument, memorandum, or entry in a book, and may be compelled to do so if the writing is present in court. It does not seem to be necessary that the writing should have been made by the witness himself, nor that it should be an original writing, provided, after inspecting it, he can speak of the facts from his own recollection. So, also, where the witness recollects that he saw the paper while the facts were fresh in his memory, and remembers that he then knew that the particulars therein mentioned were correctly stated. And it is not necessary that the writing thus used to refresh the memory should itself be admissible in evidence; for, if inadmissible in itself, as for want of a stamp, it may be referred to by the witness. But where the witness neither recollects the facts, nor remembers to have recognized the written statement as true, and the writing was not made by him, his testimony, so far as it is founded upon the written paper, is but hearsay; and a witness can no more be permitted to give evidence of his inference from what a third person has written, than from what a third person has said." In section 437 the cases in which writings are permitted to be used to assist memory are divided into three classes, namely: "(1) Where the writing is used only for the purpose of assisting the memory of the witness. (2) Where the witness recollects having seen the writing before, and, though he has no independent recollection of the facts mentioned in it, yet remembers at the time he saw it he knew the contents to be correct. (3) Where the writing in question neither is recognized by the witness as

one which he remembers to have seen before, nor awakens his memory to the recollection of anything in it, but nevertheless, knowing the writing to be genuine, his mind is so convinced that he is, on that ground, enabled to swear positively as to the fact." The writing to which Mr. Irish referred was the shorthand notes made by himself as official reporter. It was his duty to make these notes correctly, and it must be presumed that they were so made. It is certainly clear that under these facts it was competent for Mr. Irish to testify from his notes as to the matter inquired about, under the second rule as above stated, notwithstanding he had no independent recollection of the facts. That the shorthand notes were not intelligible to persons generally, does not remove the application of the rule, any more than if they had been written in a foreign language. There was no error in overruling the objection.

V.  Appellant contends that the verdict is contrary to the evidence and the instructions of the court. The instructions are not before us, and we can therefore only inquire as to whether the verdict is contrary to the evidence. In this connection, it is claimed that, under the law, Ollie Newman is an accomplice, and therefore the defendant cannot be convicted, under her testimony alone, unless she be corroborated, as provided in section 4559, of the Code. No provision is made in section 3864, of the Code, for punishing a pregnant woman upon whom a criminal miscarriage has been produced, and it certainly has never been held in this state that she is subject to punishment. The courts of many of the states have held that she is not an accomplice, and that corroboration of her evidence is not required, to sustain a conviction. See *Com. v. Boynton*, 116 Mass. 343; *Com. v. Wood*, 11 Gray, 85; *Watson v. State*, 9 Tex. App. 237; *Dunn v. People*, 29 N. Y. 523; *People v.*

*Vedder*, 34 Hun. 280.  *People v. Josselyn*, 39 Cal. 398, is cited, but that case rests upon a statute providing that one charged with this crime, cannot be convicted upon the testimony alone of the woman upon whom the crime was performed.  While we are of the opinion that Ollie Newman is not within the rule of the statute as to corroboration, if that rule may be applied she is abundantly corroborated in her evidence tending "to connect the defendant with the commission of the offense."  There can be no question but that Ollie Newman came to the defendant for the purpose of having a miscarriage produced; that the defendant, knowing that fact, proceeded to treat her; and that a miscarriage followed the treatment.  There is really but one disputed fact in the case, and that is, whether the defendant administered the treatment for the purpose, and in a manner to prevent or to produce the miscarriage.  The testimony of William Weston, and of Dr. Maple, leaves no doubt upon the subject. It is also claimed, in this connection, that the verdict was the result of coercion, and not the deliberate judgment of the jury.  It appears that the jury retired about three o'clock Friday, and returned their verdict about four o'clock next day; that some of the jurors learned, through the bailiff in charge, that the judge presiding was going away at noon on Monday following, and some of the jurors were led to understand that the jury would be held together until Monday unless they agreed sooner. There is nothing whatever to show that the jury was influenced in its conclusion by this rumor, and we do not think the defendant was prejudiced by it.  In view of the state of the testimony, and the length of time the jury deliberated, we think it clear that their conclusion was not influenced by any other consideration than the evidence and instructions.  We think from the record before us that the appellant had a

full and fair trial, that there was no prejudicial error in any of the rulings of the court complained of, and that the verdict is fully sustained by the evidence. The judgment of the district court is, therefore, AFFIRMED.