STATE v. JERRY LEE STAAT.

192 N. W. (2d) 192.

November 12, 1971—No. 41472.

*C. Paul Jones*, State Public Defender, and *Rosalie E. Wahl*, Assistant State Public Defender, for appellant.

*Warren Spannaus*, Attorney General, *George M. Scott*, County Attorney, and *Henry W. McCarr, Jr.*, and *David G. Roston*, Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Murphy, Otis, Rogosheske, and Rolloff, JJ.

ROGOSHESKE, JUSTICE.

Defendant appeals from a judgment of conviction of unlawful possession of narcotics in violation of Minn. St. 1969, §§ 618.01, 618.02, and 618.21. The dispositive issue raised is whether the trial court erred in ruling that the physician-patient privilege created by Minn. St. 595.02(4) did not bar admission into evidence of two bottles of narcotic drugs discovered on defendant's person when he was brought to the hospital in an unconscious and critical condition. We hold the ruling was not erroneous and affirm defendant's conviction.

On the morning of June 6, 1967, a Hennepin County General Hospital ambulance crew responded to an anonymous call and found the defendant lying unconscious in a Minneapolis city park. Alerted by the ambulance driver, Dr. Thomas Coulon (a resident physician) and a hospital orderly were present in the emergency room when defendant, still unconscious and critically ill, was brought in on a stretcher. Simultaneously with the resident's efforts to "evaluate" defendant's condition, the orderly removed and searched defendant's shirt and pants. Substantial evidence indicates that this procedure in this type of case is hospital routine to prepare an unconscious patient for the doctor's preliminary examination, to discover the patient's identity, and to make an inventory of his personal belongings. However, there is conflicting evidence in the record that the resident physician, while examining defendant, directed the orderly to "[f]ind something." The orderly's search produced a wallet and identifi-

cation cards, some loose change, and two small bottles containing codeine sulphate and dihydrocodeinone, both of which are opium derivatives classified under our statutes as narcotic drugs. Upon discovery of the bottles and the doctor's observation of needle marks on defendant's arm, Dr. Coulon immediately had the orderly move defendant to the postanesthesia recovery room on the fourth floor of the hospital for treatment by Dr. Erik Carlson, the intern then on duty, whom Dr. Coulon advised of his findings and to whom the orderly delivered the two bottles.

A Minneapolis police officer shortly appeared at the hospital, having been alerted through an arrangement whereby the hospital notifies the police department when a patient suspected of taking an overdose of drugs is admitted. After talking to the orderly, the ambulance driver, and the doctors; observing the defendant as he was undergoing treatment; and obtaining possession of the two bottles from Dr. Carlson, the officer placed a hold on defendant so that the police department would be informed when he was ready to be released from the hospital. He was released to the custody of the police the following evening. A complaint charging defendant with unlawful possession of narcotics was filed and a warrant was issued the next day.

Subsequent to a preliminary hearing and bindover but prior to trial, defendant moved to suppress the two bottles containing the drugs. Based upon the testimony of the ambulance driver and the orderly, which was submitted by the state, the trial court denied suppression. At a jury-waived trial both physicians testified for the state, and the court admitted the bottles of drugs into evidence. Following trial, the defendant was found guilty as charged and sentenced to imprisonment for an indeterminate term of not to exceed 5 years. Defendant appeals from his conviction on the grounds that the two bottles of narcotic drugs should have been ruled within the physician-patient privilege and therefore inadmissible, and that the evidence is insufficient to support his conviction.

At common law, confidential communications between physi-

cian and patient, like confidential communications generally, were not legally privileged. This rule has been changed by statute in many states, beginning with New York in 1828. 2 N. Y. Rev. Stat. 1829, Part 3, c. 7, Tit. 3, § 73. Minn. St. 595.02(4)[1] provides in part:

"A licensed physician or surgeon, or dentist shall not, without the consent of his patient, be allowed to disclose any information or any opinion based thereon which he acquired in attending the patient in a professional capacity and which was necessary to enable him to act in that capacity."

The theory underlying this privilege is that a patient's fear of an unwarranted, embarrassing, and detrimental disclosure in court of information given to his doctor would deter the patient "from freely disclosing his symptoms to the detriment of his health." Snyker v. Snyker, 245 Minn. 405, 408, 72 N. W. 2d 357, 359 (1955); State v. Fontana, 277 Minn. 286, 152 N. W. 2d 503 (1967). In Snyker we noted that it was then recognized that this theory is highly speculative and the privilege often criticized. In Nelson v. Ackermann, 249 Minn. 582, 83 N. W. 2d 500 (1957), the privilege was exhaustively considered, and it was observed that it is probably the most abused privilege in the field of evidence. See, also, 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2380a; McCormick, Evidence, § 108. Despite persistent academic and judicial criticism of this evidentiary privilege as an impediment to the ascertainment of truth, it is nevertheless our duty to enforce it to the full extent reasonably necessary for the attainment of the longstanding legislative policy for which it was created, namely, to provide a shield for safeguarding and promoting confidential communications between a patient and his attending physician.

---

[1] The physician-patient privilege was initially enacted in the Territory of Minnesota in 1851. Rev. Stat. (Terr.) 1851, c. 95, § 53. That provision has been amended by R. L. 1905, § 4660; L. 1919, c. 513, § 1; L. 1967, c. 640, § 1.

398

Accordingly, as the statute requires, we must determine whether the evidence in a particular case establishes (1) that a physician-patient relationship existed; (2) that the "information" acquired by the physician was of the type contemplated by the statute; (3) that such information was acquired by the physician in attending the patient; and (4) that the information was necessary to enable him to act in a professional capacity. Assuming, as do the parties, that the legislature intended no distinction between civil and criminal proceedings in the statute's application,[2] this court has held that the burden rests upon

[2] As originally enacted, the privilege applied only to civil cases. Both parties understandably assume that the statutory privilege now applies to criminal cases since we have held a physician's testimony inadmissible in such cases although, so far as we can ascertain, without directly considering whether application of the statute to criminal proceedings was intended by the legislature. State v. Fontana, 277 Minn. 286, 152 N. W. 2d 503 (1967); State v. Boerner, 267 Minn. 539, 127 N. W. 2d 555 (1964); State v. Peterson, 266 Minn. 77, 123 N. W. 2d 177 (1963); State v. Rediker, 214 Minn. 470, 8 N. W. 2d 527 (1943). Apparently a majority of the jurisdictions having the privilege apply it to criminal proceedings, usually, as in this state, by judicial assumption. Annotation, 7 A. L. R. 3d 1458.

While we do not intimate that this assumption is unwarranted in view of the broad language of our statute, the reference to both civil and criminal proceedings in the provision relating to competency of witnesses preceding the medical-privilege exception (Minn. St. 595.02), and exceptions to the privilege with respect to the requirement of a physician reporting gunshot wounds (§ 626.52 et seq.) and child-abuse cases (§ 626.554, subd. 6), it should be noted that in numerous jurisdictions the statutory language specifically limits the privilege to civil proceedings. Calif. Evidence Code Ann. § 998 (West 1966); Hawaii Rev. Stat. § 621-20 (1968); Idaho Code, § 9-203 (1969 Cumulative Pocket Supp.); Kansas Stat. Ann. § 60-427 (1969) (applies in civil actions and prosecutions for misdemeanors); 1947 Mont. Rev. Codes, § 93-701-4 (Repl. Vol. 7, 1964); Ore. Rev. Stat. § 44.040 (1969); Purdon's Pa. Stat. Ann. tit. 28, § 328 (Perm. ed.); P. R. Laws Ann. tit. 32, § 1734 (1968); S. D. Comp. Laws Ann. § 19-2-3 (1967); Utah Code Ann. § 78-24-8 (1953); 1950 Va. Code, § 8-289.1 (1971 Supp.). Rule 43h(4), Alaska Rules of Civil Procedure, similarly limits the privilege. It may be noted that in juris-

the claimant of the privilege to establish all the facts necessary to invoke it. State v. Anderson, 247 Minn. 469, 78 N. W. 2d 320 (1956). See, Brown v. St. Paul City Ry. Co. 241 Minn. 15, 62 N. W. 2d 688, 44 A. L. R. 2d 535 (1954); 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2381. Thus, to prevent disclosure of the physician's observations of the discovery of defendant's possession of the drugs in this case, the evidence must persuade the trial court to find that (1) a confidential physician-patient relationship existed between defendant and the hospital physicians and other persons participating in defendant's examination and treatment, (2) during which they acquired "information" of the type contemplated by the statute, (3) while attending him, and (4) which was necessary for medical diagnosis and treatment. Whether such foundational facts have been established is a question of fact to be determined by the trial court. State v. Ander-

dictions which extend the privilege to criminal proceedings, it is often stated that the statute will not apply where its effect would be to bar evidence in furtherance of crime or where a patient's consultation of a physician was for the purpose of aiding in the commission or concealment of a crime. See, e. g., Sticha v. Benzick, 156 Minn. 52, 194 N. W. 752 (1923); McKenzie v. Banks, 94 Minn. 496, 103 N. W. 497 (1905); Pierson v. People, 79 N. Y. 424 (1880); People v. Lay, 254 App. Div. 372, 5 N. Y. S. 2d 325 (1938), affirmed, 279 N. Y. 737, 18 N. E. 2d 686 (1939); State v. Boehme, 71 Wash. 2d 621, 430 P. 2d 527 (1967), certiorari denied sub nom. Boehme v. Washington, 390 U. S. 1013, 88 S. Ct. 1259, 20 L. ed. 2d 164 (1968); State v. Karcher, 155 Ohio St. 253, 98 N. E. 2d 308 (1951); Thrasher v. State, 92 Neb. 110, 138 N. W. 120 (1912); Seifert v. State, 160 Ind. 464, 67 N. E. 100 (1903); State v. Smith, 99 Iowa 26, 68 N. W. 428 (1896); 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2385; National Conference of Commissioners on Uniform State Laws, Uniform Rules of Evidence, Rule 27; A. L. I. Model Code of Evidence, Rules 220 to 223. As the comment on Rule 222 of the Model Code of Evidence puts it: "The policy supporting the privilege cannot prevail where the consultation was for the purpose of enabling anyone to commit a crime or a civil wrong, or to avoid the consequences of such conduct. It may be important to provide medical aid to wrongdoers, but not at the price of encouraging illegal conduct." A. L. I. Model Code of Evidence, p. 162 (1942).

son, *supra;* 5 Jones, Commentaries on Evidence (2 ed.) § 2184. It follows that where the testimony is conflicting, the trial court's finding must be sustained if there is reasonable evidence to support it.

Viewing the evidence bearing on the establishment of the foundational facts most favorably to sustain the ruling of the trial court, as we must, and disregarding the orderly's conduct for the present, there can be no serious doubt that a confidential physician-patient relationship developed between defendant and the hospital physicians since the physicians surely were required to give diagnosis and treatment. Defendant's unconsciousness does not militate against this relationship, Palmer v. Order of United Commercial Travelers, 187 Minn. 272, 245 N. W. 146 (1932), and we have recently held that the privilege applies to "public" as well as "private" physician-patient relationships. State v. Fontana, *supra.* We also believe that the contents of the bottles falls within the scope of knowledge gained by the physicians, since the statute's broad language encompasses physical articles as well as verbal communications and any other knowledge, such as the fact there were needle marks on defendant's arms, which Dr. Coulon obtained through his observation and examination. Palmer v. Order of United Commercial Travelers, *supra.* Indeed, the state does not dispute the existence of both foundational facts since the evidence is undisputed and compels such findings.

The critical question of fact, however, is whether the two containers of drugs were acquired by the orderly in a routine search of defendant or by Dr. Coulon in the course of his preliminary examination and evaluation of the patient's condition within the contemplation of the statute. The latter can only be the case if the evidence as a matter of law compels the finding that the orderly in searching defendant was acting as an agent or servant of the physician. We have held that the physician-patient privilege "extends by implication to nurses or attendants who are employees or acting under the direction of the physician examin-

ing or treating the patient." Ostrowski v. Mockridge, 242 Minn. 265, 273, 65 N. W. 2d 185, 190 (1954). Thus, to justify application of the privilege, the trial court had to be persuaded that the bottles of drugs were obtained by the orderly "as an aid to the physician attending him, and only for the purposes of diagnosis or treatment." State v. Anderson, 247 Minn. 469, 477, 78 N. W. 2d 320, 326 (1956). As with other privileges, the privilege is essentially designed to forbid compulsory disclosure by the person to whom the confidence was extended. It therefore does not exempt a third person who overheard the conversation or gained the information, with or without the knowledge of the patient, from testifying unless the third person is an agent of the physician. McCormick, Evidence, § 104; 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2381, citing Leonczak v. Minneapolis, St. P. & S. S. M. Ry. Co. 161 Minn. 304, 201 N. W. 551 (1924).

It may be noted that Dr. Coulon's testimony concerning the discovery of the two bottles was merely corroborative of the orderly's testimony, since that testimony alone, if accepted, would have established the essential element of possession. The evidence pertinent to whether the orderly was acting as an agent of the physician is far from clear. A fair summary of the orderly's testimony is to the effect that he routinely conducts a search of an unconscious patient to determine his identity and to discover anything that might be of aid to the physician the orderly is assisting. However, he did testify, "As I was taking his shirt off, the doctor told me—his exact words were, 'Find something, John,' and so I proceeded to search the patient," declaring in further explanation that he would have done so without such instructions. Dr. Coulon could not recall this conversation, and although his testimony is not inconsistent with that of the orderly, he also agrees that the orderly's assigned duties require him routinely to disrobe the unconscious patient and to search him. It was the trial court's responsibility to determine whether the orderly as an employee of the hospital discovered the drugs while acting as an agent of the physician or while performing his ordi-

nary functions as a hospital employee. We cannot say that the trial court was, as a matter of law, required to find agency. The mere fact that a physician gives instructions does not give rise to a master-servant relationship or the application of the so-called borrowed-servant principle, especially where such instructions duplicate the assigned duties of the hospital employee. See, e. g., Hohenthal v. Smith, 72 App. D. C. 343, 114 F. 2d 494 (1940). While the resolution of this issue is not without difficulty, it surely is a question of fact for which a decision either way would find support in the evidence. The test is the physician's control over the hospital employee, and the helpful cases are found mainly in malpractice actions. To hold that the orderly under this evidence was the hospital physician's servant as a matter of law, so as to make the physician vicariously liable for any negligent act committed by the orderly in the course of assisting the physician, would hardly be justified upon this record. Synnott v. Midway Hospital, 287 Minn. 270, 178 N. W. 2d 211 (1970); Swigerd v. City of Ortonville, 246 Minn. 339, 75 N. W. 2d 217, 72 A. L. R. 2d 398 (1956); Saint Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. 2d 637 (1942).

The evidence is also confusing and uncertain with respect to whether discovery of the narcotics was "necessary" to enable the physicians to act in their professional capacity.[3] However, we need not resolve this question of fact and the intended mean-

[3] Dr. Coulon testified that the circumstances of defendant's admission, his youth, and the markings on defendant's arms, as well as the bottles in his possession, led him to believe that this was a drug overdose case. He stated that finding the bottles was of very definite value in treating defendant but, in elaborating, explained that "it got him to the Recovery Room maybe a little bit quicker." Dr. Carlson testified that defendant could not be adequately treated unless the treating physician knew what drugs he had ingested since for some drugs there are specific antidotes, but he then testified that no specific treatment was required to counteract the drugs in this instance and that the treatment proceeded without ever ascertaining whether taking the drugs in the bottles was in fact the cause of defendant's condition.

ing of the statutory language with respect to this requirement as the absence of one essential fact requisite to extending the privilege to a claimant is fatal. Brown v. St. Paul City Ry. Co. *supra;* 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2381.

In summary, we find adequate evidentiary support in this record for the trial court's conclusion that the evidence failed to establish all essential facts to require the suppression of all testimony relating to the confiscated bottles of narcotic drugs. We are mindful that the trial court could have justifiably decided otherwise and barred admission of the drugs.

Our reference in the margin to the history of our statute and the application of similar statutes in other jurisdictions, as well as to persistent criticism of the medical privilege, is not to be taken as an indication that we do not believe the privilege cannot be justifiably invoked in criminal proceedings involving prosecution for drug abuse. Rather, it is intended to emphasize the problem confronting the courts in applying statutes enacted when their potential application to cases such as this was quite certainly unanticipated and to seek to demonstrate that our statute is in urgent need of revision. Had the trial court found the facts justified invoking the privilege in this case, criticism of the result could justifiably be directed only at the statute and not at a trial judge's factual finding of a disputed fact. Surely the time is here when a reconsideration of the statute, such as was given when legislation requiring the reporting of treatment of gunshot wounds and of child-abuse cases was enacted, would result in the balancing of two competing public policies—the need to encourage defendants afflicted with drug addiction to seek medical attention without fear that the physician will be compelled to disclose incriminating evidence in court, and the need to ensure that those trafficking in drugs will not be able to use the privilege as a shield to conceal the commission of a crime and thereby defeat the proper objectives of the administration of justice.

We find defendant's contention on oral argument that the evidence is insufficient to sustain his conviction to be without merit.

**Affirmed.**

OTIS, JUSTICE (dissenting).

I cannot accept the notion that when an orderly searches the person of a patient in the presence of the attending physician, who directs the orderly to "[f]ind something," the orderly is acting independently of the doctor, if the immediate objective is to discover what drug, if any, has rendered the patient unconscious.