THISSEN, Justice.
In this case, we must determine whether a blood sample drawn by a medical professional during the course of emergency medical treatment is "information" within the scope of Minnesota's statutory physician-patient privilege, codified at Minn. Stat. § 595.02, subd. 1(d) (2018). The statute provides:
A licensed physician or surgeon, dentist, or chiropractor shall not, without the consent of the patient, be allowed to disclose any information or any opinion based thereon which the professional acquired in attending the patient in a professional capacity, and which was necessary to enable the professional to act in that capacity ....
Id.
Because the district court determined that the physician-patient privilege covered a blood sample, it granted the defendant's motion to suppress the results of a blood-alcohol concentration test derived from the blood sample. The court of appeals reversed, concluding that a blood sample does not fall within the plain meaning of the word "information" as used in the statute, and therefore is not subject to the physician-patient privilege. State v. Atwood , 914 N.W.2d 422, 427 (Minn. App. 2018). We agree with the court of appeals that a blood sample is not covered by the physician-patient privilege. Accordingly, we affirm.
FACTS
Appellant Heath Atwood was injured while driving an all-terrain vehicle (ATV) on June 10, 2016. Medical personnel and a Murray County Deputy Sheriff responded to the emergency call regarding the accident. When the deputy was attending to *628 Atwood and assisting medical personnel at the scene of the accident, he smelled an odor of alcohol coming from Atwood.
Atwood was transported by ambulance to the Murray County Medical Center. The deputy arrived some time later. A doctor treating Atwood for his injuries told the deputy that Atwood was receiving a blood transfusion. Atwood was then airlifted to Sanford Medical Center in Sioux Falls, South Dakota, for further medical treatment.[1]
The deputy learned from a hospital staff member that, before the start of the blood transfusion, a blood sample had been drawn from Atwood to determine his blood type, and an extra vial of blood had been stored in the medical center's laboratory.[2] No medical tests had been performed on the extra vial of blood. The deputy obtained a search warrant to seize the extra vial of blood from the laboratory. The deputy then sent the blood sample to the Minnesota Bureau of Criminal Apprehension (BCA) for alcohol-concentration testing. The result of the test showed that Atwood had a blood-alcohol concentration of 0.155, well over the legal limit.
The State charged Atwood with two counts of misdemeanor driving while impaired, under Minn. Stat. § 169A.20, subd. 1b(1), (5) (2018) (operation of an ATV while under the influence of alcohol and with a blood-alcohol concentration over 0.08). At a pretrial hearing, Atwood moved to suppress evidence of the results of testing done on the blood sample, asserting that the blood sample itself was protected by Minnesota's statutory physician-patient privilege, Minn. Stat. § 595.02, subd. 1(d). The district court agreed with Atwood and held that the blood sample and the test results that the BCA derived from it should be suppressed. The district court reasoned that, although "no Minnesota appellate court has ever explicitly and necessarily held that a physical blood sample is 'information' for purposes of Minn. Stat. § 595.02, subd. 1(d)," dicta in State v. Staat , 291 Minn. 394, 192 N.W.2d 192, 197 (1971), and State v. Heaney , 689 N.W.2d 168, 173 (Minn. 2004), suggest that a blood sample falls within the definition of "information" protected by the privilege.
The court of appeals reversed. It agreed with the district court that any relevant statements in Staat and Heaney were dicta. Atwood , 914 N.W.2d at 425. The court of appeals, however, concluded that a "blood sample" is not "information" under the statute. The court determined "information" is an unambiguous term and reversed:
"Information" has been defined as "[k]nowledge or facts learned, especially about a certain subject or event." The American Heritage Dictionary of the English Language 901 (5th ed. 2011). According to Webster's Dictionary, "information" is "something received or obtained through informing [such as:] knowledge communicated by others or obtained from investigation, study, or instruction[;] knowledge of a particular event or situation[;] facts or figures ready for communication or use as distinguished *629 from those incorporated in a formally organized branch of knowledge." Webster's Third New International Dictionary Unabridged 1160 (3d ed. 2002). Thus, information, by nature, is not physical and is about something. While information may be conveyed by way of a material object, such as a piece of paper, the medium by which information is communicated is not the information. On the other hand, a blood sample is material and does not, by itself, provide any information. That is, an individual cannot extract information about a patient solely by looking at a physical blood sample.
Id. at 427. We granted Atwood's petition for review.
ANALYSIS
The sole issue before us is whether a blood sample is "information" for purposes of the statutory physician-patient privilege. Minn. Stat. § 595.02, subd. 1(d). We review this question of statutory interpretation de novo. State v. deLottinville , 890 N.W.2d 116, 119 (Minn. 2017), cert. denied --- U.S. ----, ----, 138 S.Ct. 377, 378, 199 L.Ed.2d 278 (2017).
I.
Our first task is to determine whether our prior decisions in Staat and Heaney bind us to a particular answer to the question of whether a blood sample is "information" under the statute. We are bound to our prior statements or rulings on an issue only when the statement or ruling was necessary to the decision in the case. See Jaeger v. Palladium Holdings, LLC , 884 N.W.2d 601, 610-11 (Minn. 2016). Notably, both the district court and the court of appeals determined that statements about the scope of the term "information" in Staat and Heaney are dicta. Atwood , 914 N.W.2d at 425.
In Staat , the defendant was charged with unlawful possession of narcotics. 192 N.W.2d at 195. A hospital orderly discovered two bottles of narcotics when he removed and searched the defendant's clothing during a routine evaluation at a hospital. Id. at 194-95. The doctor subsequently based his decision to treat Staat for an overdose on the discovery of the bottles. Id. at 198 n.3. Law enforcement later obtained the bottles of narcotics from the hospital. Id. at 195. The defendant sought to exclude the bottles of narcotics from the trial, asserting that this evidence was protected by the physician-patient privilege.[3] Id. at 194-95.
We stated in Staat that the defendant must satisfy each element of a four-part privilege test before the evidence would be excluded:
[T]o prevent disclosure of the [evidence at issue] ... the evidence must persuade the trial court to find that (1) a confidential physician-patient relationship existed between defendant and the hospital physicians and other persons participating in defendant's examination and treatment, (2) during which they acquired 'information' of the type contemplated by the statute (3) while attending him, and (4) which was necessary for medical diagnosis and treatment.
Id. at 197. We held that because the hospital orderly who discovered the narcotics bottles was not acting as an agent of the doctor during the initial removal and search of the defendant's clothing, Staat failed to satisfy the third prong of the test. Id . at 198. That holding disposed of the *630 case because failure under any one of the four prongs of the test doomed the defendant's assertion of the privilege. Id .
Before reaching that determinative conclusion, we walked through the first two prongs of the test even though "the state [did] not dispute the existence of ... foundational facts" as to those two prongs. Id . at 197. In so doing, we stated-without explicit statutory or policy analysis-that "the contents of the bottles falls within the scope of knowledge gained by the physicians, since the statute's broad language encompasses physical articles as well as verbal communications and any other knowledge ... which [the doctor] obtained through his observation and examination." Id. The comments were not necessary to the decision in Staat because the defendant's claim failed under the third prong of the physician-patient privilege test. As important, our analysis in Staat did not mention the term "information."
Atwood claims that the discussion in Staat of the "information" prong was necessary because each step of the four-pronged privilege test is sequential, meaning that the court cannot reach the third prong without addressing the first two prongs. It follows, Atwood argues, that our statements in Staat regarding the first two prongs of the test were essential to the holding. Atwood solely supports this argument with the observation that we never reached or addressed the fourth prong of the test in Staat . We are not persuaded. Nothing in Staat or any of our other physician-patient privilege cases suggests that the four-prong test must be analyzed sequentially. Indeed, we held in Staat that "the absence of one essential fact requisite to extending the privilege to a claimant is fatal." Id. at 198 ; see State v. Sam , No. C9-00-1426, 2001 WL 641522, at *4 (Minn. App. June 12, 2001) (stating that "[t]he absence of any factor is fatal" to the privilege), rev. denied (Minn. Aug. 22, 2001). Our discussion in Staat of whether the bottles of narcotics were subject to the privilege was not necessary to the court's holding and therefore is nonbinding dicta.
In Heaney , an officer responded to a car accident involving fatalities in Houston County. 689 N.W.2d at 170. At the scene, the defendant, who admitted that he had consumed alcohol before driving, failed a preliminary breath test. Id. The defendant was then transported to the nearest hospital, which happened to be in La Crosse, Wisconsin, where he refused to consent to give a blood sample but subsequently agreed to provide a urine sample. Id. at 170-71. At that time, nearly three hours after the car accident, the defendant had a blood-alcohol concentration of 0.08. Id. at 171. The officer later learned that a blood sample had been taken from the defendant within two hours of the accident and the hospital had performed a blood-alcohol concentration test on the blood sample. Id. The officer obtained the blood sample and test results pursuant to a subpoena for the records issued by the La Crosse County District Court and in accordance with Wisconsin law.[4] Id.
When prosecutors in Houston County later charged the defendant with criminal vehicular operation resulting in death, the district court applied Minnesota's physician-patient privilege statute to suppress the blood-alcohol concentration evidence.
*631 Id. On appeal to our court, the State argued that the district court should have applied Wisconsin law and allowed the State to introduce the blood-alcohol evidence. Id. We applied the "significant relationship" conflict of laws approach and held that because Wisconsin had the most significant relationship to the defendant, Wisconsin law applied. Id. at 175-77.
Atwood points to our assumption in Heaney that a conflict existed between the Minnesota and Wisconsin laws regarding the application of the physician-patient privilege to blood-alcohol concentration evidence to support his position that we have already determined that a blood sample falls under the protection of the Minnesota privilege. Admittedly, we cited Staat (without any further analysis) for the proposition that evidence of Heaney's blood-alcohol concentration would be inadmissible under Minnesota law. Id. at 173.
Atwood, however, tries to make our comment do too much work. First, our assumption in Heaney that a conflict existed between the Minnesota and Wisconsin laws was not essential to the holding or the result in the case. Had we reached an alternative conclusion about Minnesota law-that the blood-alcohol evidence was not protected by the Minnesota privilege-the outcome of the case would have been the same: the evidence would be admissible at trial. That is the paradigmatic example of nonessential dicta. Further, contrary to the dissent's assertion, our decision in Heaney did not "thoroughly investigate" and "consider with care" the specific question of whether a blood sample is information under the physician-patient privilege statute. We merely asserted our conclusion with a citation to Staat .
Moreover, we did not clearly articulate in Heaney whether the privileged "information" to be suppressed was the blood sample (the question we must decide in this case) or the blood-alcohol concentration test result, or both. Because the exception to the physician-patient privilege in Wisconsin states that "[t]here is no privilege concerning the results of or circumstances surrounding any chemical tests for intoxication or alcohol concentration ," Wis. Stat. § 905.04, subd. 4(f) (2018) (emphasis added), it seems likely that we were focused more on the conflict over admission of the test result rather than whether the blood sample itself was privileged. In any event, the ambiguity gives us further reason to conclude that the statement in Heaney is not binding precedent but is dicta.
Thus, whether a blood sample is "information," and therefore protected by Minnesota's physician-patient privilege statute, is an issue of first impression and we engage in a clean slate statutory analysis.
II.
The physician-patient privilege did not exist at common law in Minnesota. It has no constitutional underpinnings. See State v. Enebak , 272 N.W.2d 27, 30 (Minn. 1978) ("[T]he medical privilege is a statutory creation and not a constitutional right."). It is solely a creature of statute. See Minn. Stat. § 595.02, subd. 1(d) ; Staat , 192 N.W.2d at 195 (noting the privilege's origins in statute).
Noting that "[t]here probably is no privilege in the field of evidence so abused as the physician[-]patient privilege," we have generally construed the statute narrowly.[5]
*632 Nelson v. Ackermann , 249 Minn. 582, 83 N.W.2d 500, 506 (1957). And for good reason: assertion of the privilege keeps from the factfinder evidence that is relevant to ascertaining the truth. See id . at 510-11. Accordingly, "[a]lthough courts must be alert to safeguard the purpose of evidentiary privileges, they must be equally alert to see that these privileges are not enforced in such a blind and sweeping manner that they unnecessarily become vehicles for the suppression of evidence which is not privileged." Snyker v. Snyker , 245 Minn. 405, 72 N.W.2d 357, 359 (1955) ; see Larson v. Montpetit , 275 Minn. 394, 147 N.W.2d 580, 586 (1966) ("[E]videntiary privileges constitute barriers to the ascertainment of truth and are therefore to be disfavored and narrowly limited to their purposes ....").
With these principles in mind, we turn to our central inquiry: Is a blood sample "information" to which the statutory physician-patient privilege applies? We conclude based on the plain and common meaning of the word "information" that it is not.[6]
We start where we must in statutory interpretation cases. We seek to understand and implement the intent of the legislature. See State v. Henderson , 907 N.W.2d 623, 625 (Minn. 2018). The physician-patient privilege statute does not define the term "information" and we may look to non-statutory sources like dictionary definitions to discern the "common and approved usage" of the word "information" as used in the physician-patient privilege statute. Minn. Stat. § 645.08(1) (2018) ; see Shire v. Rosemount, Inc. , 875 N.W.2d 289, 292 (Minn. 2016).
The physician-patient privilege statute-and, in particular, the proposition that the privilege is limited to "information" acquired in attending a patient-has been on the books in Minnesota since territorial days and has remained substantially intact for 168 years and counting.[7] The territorial *633 legislature based the statutory language on the original physician-patient statute adopted in the State of New York in 1829.[8] See Staat , 192 N.W.2d at 195 (citing to 2 N.Y. Rev. Stat., pt. III, ch. 7, tit. 3, art. 8, § 73 (1829)).
Considering this history and the Legislature's enduring and unchanging use over so many decades of the term "information" acquired in attending a patient, the best clue to understanding the Legislature's intent is to look to the meaning of "information" when the statute was enacted. The word "information" had a clear meaning in the first half of the nineteenth century. Webster's 1828 American Dictionary of the English Language-published the same year that New York enacted its physician-patient privilege statute-defined the word "informtion" (sic) as "[i]ntelligence; notice, news or advice communicated by word or writing" or "[k]nowledge derived from reading or instruction ... [or] from the senses or from the operation of the intellectual faculties." Webster's American Dictionary of the English Language (Online ed. 1828) http://www.webstersdictionary1828.com/Dictionary/Informtion (last visited Mar. 4, 2019) [opinion attachment]. This definition plainly does not include a blood sample.[9]
A blood sample is not "intelligence; notice, news, or advice communicated by word or writing." A blood sample itself is not knowledge. Information can only be derived from the blood by first acting upon the sample through testing or an analysis of it. Thus, a blood sample itself is not "information" under the plain meaning of the term in the statute.[10] See People v. Elysee , 49 A.D.3d 33, 847 N.Y.S.2d 654, 659 (2007) (holding that a physical blood sample does not fall within the scope of New York's statutory physician-patient privilege), aff'd on other grounds , 12 N.Y.3d 100, 876 N.Y.S.2d 677, 904 N.E.2d 813 (2009).
*634 Atwood argues that because blood carries information within it, a blood sample should be protected. He contends that when law enforcement was allowed to obtain Heaney's blood sample, it was the effective equivalent of obtaining the information carried in the blood. That may be true, but the Legislature chose not to extend the protection of the privilege that far.[11] The statute does not by its terms prohibit disclosure of "objects that contain or carry information." It simply prevents doctors from disclosing "any information or any opinion based thereon." Minn. Stat. § 595.02, subd. 1(d) ; see State v. Hensel , 901 N.W.2d 166, 178 (Minn. 2017) ("[I]t is impermissible to add words or phrases to an unambiguous statute." (citation omitted) (internal quotation marks omitted)).[12]
*635 The power to add those words to the statute rests in the hands of the Legislature.
The plain and ordinary meaning of the word "information" as used in Minn. Stat. § 595.02, subd. 1(d), does not include a blood sample. Thus, in this case, the physician-patient privilege does not apply to Atwood's blood sample and the results of the BCA's blood-alcohol concentration test derived from the blood sample. The district court therefore erred in suppressing that evidence.
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals and remand to the district court for proceedings consistent with this opinion.
Affirmed.
Dissenting, Gildea, C.J.
DISSENT

Atwood's critical injuries made it impossible for the deputy to obtain a blood sample by consent. Further, even if the deputy obtained consent or got a warrant for a blood draw, the blood transfusion which occurred before the deputy arrived at the hospital would have rendered the blood draw meaningless for purposes of determining blood-alcohol concentration.

The hospital did not run a test to determine Atwood's blood-alcohol concentration. This case does not present the issue of whether the result of a blood-alcohol concentration test, procured by a doctor in the course of medical treatment, is protected "information" under the physician-patient privilege.

At the time, the privilege was set forth in Minn. Stat. § 595.02(4) (1971). That language was nearly identical to the current statute.

Wisconsin's physician-patient privilege statute is similar to Minnesota's physician-patient privilege statute except that it makes exceptions that carve out from the privilege some homicide cases and the results of a doctor-ordered intoxication or alcohol concentration test. See Heaney , 689 N.W.2d at 173 (citing Wis. Stat. § 905.04, subd. 4(d), (f) (2001-02)). The Wisconsin statute does not address whether a blood sample itself is subject to the privilege.

See, e.g. , State v. Odenbrett , 349 N.W.2d 265, 268 (Minn. 1984) (holding that the Child Abuse Reporting Act works to preempt the privilege); Soukup v. Summer , 269 Minn. 472, 131 N.W.2d 551, 554-55 (1964) (holding that the district court acted within its discretion to instruct the jury to allow for an adverse inference when an injured party refused to allow medical records pre-dating the accident to be admitted by asserting the privilege); Maetzold v. Walgreen Co. , 249 Minn. 572, 83 N.W.2d 233, 235 (1957) (allowing a treating physician to testify to hypotheticals that exclude all information obtained by examining or treating the patient and holding that such testimony does not contravene the statutory prohibition); In re Estate of Koenig , 247 Minn. 580, 78 N.W.2d 364, 368-69 (1956) (construing the statute narrowly to allow the executor of a patient's will to waive the physician-patient privilege of the patient after her death); Price v. Standard Life & Accident Ins. Co. , 90 Minn. 264, 95 N.W. 1118, 1120 (1903) (concluding that a physician may testify to the fact that the insured was his patient, and the number of times that the physician attended to him); State v. Gillespie , 710 N.W.2d 289, 298 (Minn. App. 2006) (holding that because the privilege is personal a criminal defendant cannot assert the privilege of another person as a shield), rev. denied (Minn. May 16, 2006).

We understand the dissent's desire to protect blood samples from disclosure as captured in the dissent's opening line: "Minnesotans will be surprised to learn that blood samples and other biological specimens they provide to their doctors during medical treatment are not protected by the physician-patient privilege ...." But our job is not to impose our view of what Minnesotans may want or need; rather, it is our job to implement the intent of the Legislature. Moreover, we further note that the Legislature has enacted important medical privacy protections for Minnesotans that remain unaffected by our decision today. See, e.g. , Minnesota Health Records Act, Minn. Stat. §§ 144.291 -.34 (2018); see also Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d et. seq. (2018).

The original 1851 statute provided that "[a] regular physician or surgeon cannot, without the consent of his patient, be examined in a civil action, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient." Minn. Rev. Stat. (Terr.) ch. 95, § 53(4) (1851).

The New York statute provided:
No person duly authorised to practice physic or surgery, shall be allowed to disclose any information which he may have acquired in attending any patient, in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him, as a surgeon.
2 N.Y. Rev. Stat. pt. III, ch. 7, tit. 3, art. 8, § 73 (1829).

Modern definitions of the term "information" also support our conclusion. "Information" is defined in contemporary dictionaries as "knowledge communicated by others or obtained from investigation, study, or instruction." Webster's Third New International Dictionary 1160 (2002). It is also defined as "[k]nowledge or facts learned, especially about a certain subject or event." The American Heritage Dictionary 901 (5th ed. 2011).

The dissent emphasizes that the Legislature failed to affirmatively modify the statute after our one sentence pronouncement in Heaney . This argument assumes that the principle of stare decisis applies to our prior decision in Heaney . The dissent glosses over the fact that we have rejected Heaney as binding precedent. We do not believe stare decisis applies at all. And the legal principle relied on by the dissent-that a lack of subsequent legislative action means that stare decisis applies with more force-does not create binding precedent out of whole cloth. Further, contrary to the dissent's argument, the Legislature has not amended Minn. Stat. § 595.02, subd. 1(d) -the physician-patient privilege provision included in the broader statute governing witness competency-since 2004, the year we decided Heaney . The amendments to the witness-competency statute to which the dissent cites deal with sexual assault counselors, Minn. Stat. § 595.02, subd. 1(k), mediators, Minn. Stat. § 595.02, subd. 1(m), and communications assistants for a telecommunications relay system for persons with communication disabilities, Minn. Stat. § 595.02, subd. 1(o). Nothing about those amendments suggests that the Legislature considered the physician-patient privilege statute and "chose" to leave it unchanged.

The dissent's question of whether the physician-patient privilege protects patient medical records contained on a flash drive that a patient hands to his doctor is not at issue in this case. In other cases, we noted that written medical records are generally covered by the physician-patient privilege. See generally State v. Evans , 756 N.W.2d 854, 872 (Minn. 2008). That conclusion is consistent with the physician-patient privilege statute since the medical record is a written record of the information conveyed by the patient to the doctor and the opinion derived by the doctor from that information. The conclusion is consistent with the longstanding definition of "information" as "[i]ntelligence; notice, news or advice communicated by word or writing ." Webster's American Dictionary of the English Language (Online ed. 1828) (emphasis added). And a flash drive for the purposes of the dissent's hypothetical is merely a modern version of a stack of physical papers. The physician need only open the "document" on the flash drive; he does not need to run tests to extract information as is required in the case of a blood-alcohol analysis run on a blood sample.
We are not faced with the question of whether the results of a blood-alcohol concentration test conducted by a patient's physician (as opposed to the blood sample itself) are protected by the privilege, but there is little reason to conclude (as the dissent suggests) that such test results would not be protected. The results of a blood-alcohol concentration test conducted by the patient's physician are more like the type of information or physician opinion that is protected by the privilege. Finally, the result of a blood-alcohol concentration test conducted by law enforcement is not protected by the physician-patient privilege because in that circumstance the doctor is not attending to the patient with a view toward diagnosis and treatment. See State v. Emerson , 266 Minn. 217, 123 N.W.2d 382, 386-87 (1963) (stating that the privilege does not apply when a physician examines a person for a purpose other than to diagnose and treat the person).

Our recent decision in State v. Heinonen , 909 N.W.2d 584 (Minn. 2018), provides a useful analogy. In Heinonen , we held that consenting to a DNA test and providing a DNA sample to police does not implicate the Fifth Amendment privilege against self-incrimination. Id. at 592-94. As part of our analysis, we distinguished between the DNA sample itself and the DNA profile developed from the sample. Id . at 593-94. The basic and common sense distinction we drew between a sample and the analysis of a sample in Heinonen applies here.
The dissent asserts that our conclusion is inconsistent with our decision in Bearder v. State , 806 N.W.2d 766 (Minn. 2011). In that case, we held that blood samples collected under the State's newborn screening program constituted "genetic information" under the Genetic Privacy Act. Id. at 772-74. Bearder did not interpret the physician-patient privilege statute nor does it shed light on our analysis of the physician-patient privilege. Unlike the privilege statute, the Genetic Privacy Act included a long, technical definition of "genetic information," and based on this language, we concluded that the technical definition covered blood samples. Id. at 772 (quoting Minn. Stat. § 13.386, subd. 1 (2018) ). We also emphasized that the definition must be read in view of the purpose of the Genetic Privacy Act: "It is the DNA within the blood samples that is the information that brings the blood sample within the protection of the Genetic Privacy Act." Id. at 773. The statute prevented the using, storing, and dissemination of DNA. Id. at 774. "It would be impossible to collect, use, store, or disseminate those samples without also collecting, using, storing, or disseminating the genetic information contained in those samples." Id . This last rationale has no bearing on an analysis of the word "information" in the physician-patient privilege statute at issue in the case before us, which concerns neither DNA nor the Genetic Privacy Act.